## Geary Estate

538

*John McGrail, and Brandt, McManus, Brandt & Malone,* for accountant.

*Harvy Miller, William Jacob, and Dave Abrams,* for creditors.

McKENNA, *P.J.*, April 7, 1976—A number of claims have been filed against the above estate. Hearings were held on March 5, 1975, and on various subsequent dates, the testimony being finally closed on January 13, 1976. The estate is insolvent. The questions involved relate to the dis-

tribution of assets among creditors claiming priorities and liens.

Decedent died on April 25, 1974, at the age of 72. He left a last will and testament dated January 27, 1966. The testator was not married at the time of his death and no children survived him. He left the residue of his estate to various employes. The estate being insolvent, the legatees will not receive the bequests made to them. Pittsburgh National Bank is appointed as executor. On May 1, 1974, the will was admitted to probate and letters testamentary were issued to the bank. The will gives to the executor broad powers in administering the estate; that is, to operate decedent's business and to sell, exchange, lease, or encumber any or all of decedent's real or personal property.

At the time of his death and for some years prior thereto, decedent operated a sole proprietorship under the fictitious name of Motor Boat Sales and Service, located at 5472-74 Penn Avenue, Pittsburgh, Pa. 15206.

On August 5, 1974, the executor filed an inventory listing personal assets of $144,520.50, most of which consisted of the inventory and equipment used in decedent's business. He also left approximately one acre of land located on Edwood Road, having erected thereon a dwelling known as 3171 Edwood Road, Pittsburgh. This was valued at $27,300.

On August 2, 1974, Westinghouse Credit Corporation filed a petition to reclaim property from the executor. It averred that on or about December 7, 1972, Mr. Geary entered into a contract with Westinghouse, whereby Westinghouse acquired a security interest in the inventory of decedent in exchange for its agreement to finance the purchase

of boats for him; and also, that decedent executed a personal guarantee to petitioner. The amount claimed in said petition is $56,040.98, plus interest from July 15, 1974. On December 17, 1975, Westinghouse filed an amended claim as follows:

| | |
|---|---:|
| Principal Balance | $54,700.19 |
| Interest to December 15, 1975 | 2,602.29 |
| Counsel fees | 2,044.00 |
| | $59,346.48 |

Also interest from and after December 15, 1975 at $18.56

Westinghouse perfected its security interest by filing financing statements in the office of the Secretary of the Commonwealth and in the office of the Prothonotary of Allegheny County, on January 19, 1973.

Petitioner asserts that the inventory and collateral located on the premises of decedent at 5472 Penn Avenue are security for the claim of Westinghouse; also, that two boats, having a value of $12,112.82, on which petitioner had a lien, were missing from the inventory made on May 8, 1974. (The boats alleged to be missing and all assets were accounted for by the executor. See its statement in the inventory marked "Cambro Inc. Exhibit No. 1.")

On this petition a citation was issued directing Pittsburgh National to show cause why petitioner should not be permitted to reclaim its property. This was made returnable on August 20, 1974. Prior to the return day or on August 7, 1974, Pittsburgh National presented to the court a petition asking for permission to sell the business assets of decedent to one Michael J. Horan for

$75,000. This was made returnable on August 22, 1974, and at that time the petition for leave to sell was withdrawn because of the fact that the buyer had revoked his offer. The petition of Westinghouse for leave to repossess certain boats was continued by order of court dated August 21, 1974. No final disposition of the matter was ever made because of a sale of all of decedent's business assets, under order of this court, as hereinafter related.

On August 13, 1974, Molded Fiber Glass Boat Company filed a claim with the executor, whereby it asserts that it had entered into a purchase money security agreement with decedent on June 22, 1973. Under the terms of this, seven boats were delivered to decedent. Molded Fiber Glass retained a security interest in same. Petitioner states that the executor refused to surrender possession of said boats to petitioner. It asks for permission to repossess same. The claim of this creditor is for $9,060.19. A citation was issued on this petition directing Pittsburgh National to show cause why the prayer of the petition should not be granted. This was made returnable on September 9, 1974. As in the case of Westinghouse's petition, no final disposition was made of this request because of the sale of assets. Molded Fiber Glass had not perfected its security interest by filing same in the office of the Secretary of the Commonwealth and in the office of the Prothonotary as required by section 9-401 of the U. C. C. of April 6, 1953, P.L. 3, as amended, 12A P.S. §9-401.

On August 28, 1974, Cambro, Inc., landlord to decedent, filed its claim for delinquent rent. This goes back to December of 1973. There is a copy of the lease attached which states that the monthly

rental for the premises at 5472-74 Penn Avenue is $1,100 per month. Cambro, Inc. claims its landlord lien on personalty on the property and a preference in the payment of its claim. It is itemized as follows:

December 1, 1973 through April 25, 1974
(Date of death) at $1,100 ......    $5,316.50
December 1974 through May 1975    6,600.00
Damages for destruction of hoist    1,900.00

From April of 1974 to December, 1974, the rent was paid by executor. The assets of the estate were sold in November of 1974 and executor then vacated the premises.

On October 21, 1974, executor presented to the court a petition asking for leave to sell certain assets of the business to one Angelo Falconi for $54,000. Following a hearing the sale was approved and then consummated. The estate received $54,000 for the inventory exclusive of five boats, a trailer and a Johnson motor. Mr. Falconi also purchased a G.M.C. truck for $1,500 making total receipts to the estate $55,500. Prior to this the executor had sold other assets for $15,000.

Before the sale, or on September 12, 1974, the court, by order, directed that the executor keep a record of assets sold and the price received for each item so that the claims of Westinghouse, Molded Fiber Glass and Cambro, Inc., against particular articles, could be preserved against the proceeds of sale of said articles.

On January 3, 1975, executor filed its first and partial account, showing a balance for distribution of $101,185.37. The real estate is listed at $27,300. The loss on sale of assets is stated as $40,306.76.

The account shows, on page 7, that the bank had appropriated $10,898.30 in assets pledged to it, and applied this sum against loans Geary had at the bank. Objections to the account were filed by Westinghouse Credit Corporation on February 18, 1975. The creditor objects to these items:

1. The action of accountant in appropriating decedent's checking account in Pittsburgh National against a loan he owed the bank.

2. The bank's conversion of A.T.&T. stock pledged to it, and the application of the proceeds, $2,182.30, to its loan.

3. Accountant failed to account for personal property which was to be sold by one William Good. This objection was not pressed, it will be dismissed.

4. Accountant must be held liable for the loss resulting from sale of assets allegedly caused by the bank's delay. The inventory was $130,800 and the sale price was $90,000. Accordingly, the loss was $40,800.

5. Accountant's compensation is excessive.

At the audit on February 19, 1975, the court set March 5, 1975, as a date for hearing on the objections. There was considerable testimony taken at the hearing. This will be discussed later when the several issues for determination are considered. The various claims made were changed in amounts as the settlement of the estate continued.

The petition for distribution states that the claims against the estate are as follows:

1. Claims entitled to priority under Section 3392 of the Probate, Estates and Fiduciaries Code (20 Pa. C. S. A. 3392). These include costs

| | |
|---|---|
| of administration and the funeral bill. | $ 39,777.72 |
| 2. Demands wherein the creditors hold security or claim liens. | $ 82,223.17 |
| 3. General creditors. | $ 47,531.98 |
| Total | $169,532.87 |

\*    \*    \*    \*

On August 18, 1975, the court approved the sale of decedent's real estate for $31,000. This was consummated. There was a balance due on a mortgage to Parkvale Savings and Loan Association in the sum of $20,403.71 against the property sold, which was paid by the bank.

On October 31, 1975, the bank filed its second and final account. This shows a net balance for distribution of $92,644.80. However, the executor's fee of $8,000 plus $7,830 charged by the bank's corporate finance and management services department and attorney's fees of $10,639.85 have not been paid. Of the amount shown, $74,140.59 is held by the executor in an escrow account. This represents the proceeds of sales of boats and other inventory and is claimed by the several creditors as above noted. The account shows, on page 5, that a fee of $2,160 was paid to Michael A. Cocchiola for accounting services rendered to the estate. On page 8, it is stated that Pittsburgh National received a broker's commission of $2,170 on the sale of decedent's real estate.

On December 17, 1975, objections to the account were filed by Cambro, Inc., by Molded Fiber Glass Boat Co., and by Westinghouse Credit Corporation. Cambro complains of these items:

1. The executor's fee.

2. The executor's commission on the sale of real estate.

3. The fee paid to Michael Cocchiola, C.P.A. for accounting services.

4. Counsel fees are excessive. The fees may have been reasonable but should not have been charged to the estate in the amount shown.

5. The bank had no right to appropriate assets pledged to it, in partial satisfaction of its loan.

The objections of Molded Fiber Glass are to:

1. The executor's compensation.
2. The fee paid to Michael A. Cocchiola.
3. The attorney's fees.
4. The appropriation by the bank of collateral against its loan.

The objections of Westinghouse repeat those previously filed by this creditor.

The account came before the court for audit on December 17, 1975, and at that time a petition for distribution was presented to the court. A further hearing was set for January 13, 1976. Additional testimony was taken on that date, and a supplemental petition for distribution was filed.

The petition for distribution states that additional assets may be recovered. These include the sum of $1,187.90 payable by Century Boat Company and the sum of $4,317.58 representing the balance due on the purchase, by a Mr. Georges, of a 21-foot Century Raven Boat from the executor on June 25, 1974. Mr. Good claims title to this boat but his claim will be denied and the monies payable on this transaction will be delivered to the executor. Briefs have been filed and the case is ready for adjudication.

The issues to be determined are:

1. The executor's compensation.
2. Is the attorney fee excessive?
3. The claim of Cambro, Inc.
4. The claim of Westinghouse Credit Corporation.
5. The claim of Molded Fiber Glass Company.

These will be discussed in order.

Before discussing the specific objections to the account as raised by the creditors, we must state that the executor's compensation and the attorney fee will be reduced.

The rule as to attorney's fees is stated by Mr. Chief Justice Jones in LaRocca Est., 431 Pa. 542, 546, 264 A.2d 337 (1968), as follows:

"What is a fair and reasonable fee is sometimes a delicate, and at times a difficult question. The facts and factors to be taken into consideration in determining the fee or compensation payable to an attorney include: the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was 'created' by the attorney; the professional skill and standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question."

As to fiduciaries, in Thompson Est., 426 Pa. 270, 277, 232 A.2d 625 (1967), the Supreme Court approved the following quotation from the Fiduciaries Act of April 18, 1949, P. L. 512, 20 P. S. § 320.985: "The Court shall allow such compensa-

tion to the trustee as shall in the circumstances be reasonable and just."

Similar provisions are contained in the P.E.F. Code of June 30, 1972, P. L. 508, 20 Pa. C. S. A. §§3537, 7185.

In this case, the sole reason for the reduction of fees is that "the amount of money or the value of the property in question" will not support the charges. We do not doubt the skill of counsel and of the fiduciary in administering the estate. It was a difficult matter to handle. Both spent a considerable number of hours on the case and charged reasonable rates per hour for their time. We find, however, that it would be inequitable to award to them the amounts requested to the prejudice of lien creditors and to the preferred claims. The reductions are not substantial being $2,000 in the case of the attorneys, and $2,030.63 as to the executor. The distribution to be made is summarized at the end of this opinion and set forth in the accompanying decree.

There are several specific objections to the fees which must be resolved. Before discussing these we will consider a related matter.

*The appropriation of assets by the bank and the application of same to Mr. Geary's debt.*

The evidence indicates that the facts in regard to this transaction are as follows:

At the time of his death, decedent was indebted to the bank on three notes in the total sum of $24,534.37. He had pledged to the bank as security for these, three life insurance policies, 50 shares of A.T.&T. stock and his checking accounts at the bank. There were acceleration clauses in the notes

and all were due at the time of decedent's death. The bank applied the collateral it had secured against the debt, as follows:

| | |
|---|---|
| Proceeds of insurance | $11,865.88 |
| A.T.&T. stock sold | $2,343.75 |
|    Applied to principal | 2,182.30 |
|    Applied to interest | 161.45 |
| Mr. Geary's checking accounts | 8,500.58 |
| Balance still due | 1,824.16 |
| | $24,534.37 |

The proceeds of insurance are not part of the estate.

The creditors would have the bank place the checking accounts and proceeds from sales of stock in the general funds of the estate and relegate itself to the position of general creditor. This would obviously be unfair. The bank protected itself against an event which was certainly a possibility and became a fact, that is, Geary's insolvency. The other creditors object to the bank's doing what they themselves are attempting to do, i.e., establishing a lien on certain assets of the decedent. The bank had, by assignment from Geary, possession of the collateral and a right to apply it to the loan.

Our conclusion on this point is supported by the decision of the Superior Court in Southwark Nat'l. Bank v. Beck, 98 Pa. Superior Ct. 213 (1930). The facts in that case were similar to those in the case at bar. The court held in favŏr of the bank, saying, p. 216: "In our view the agreement amounted to a pledge of the deposit and gave the plaintiff a lien thereon. The consideration to support this agreement was the benefit to the marker of the note in

obtaining the loan. The contract was made at the time of making the note and with special reference to it."

The same principle is applicable to the A.T.&T. stock. The bank had a security interest or lien on this asset under section 9-304 of the Uniform Commercial Code, 12A P. S. §9-304. This was preserved to the bank following Mr. Geary's death by section 3381 of the P.E.F. Code, 20 Pa. C. S. A. §3381, which provides that:

"Nothing in this code shall be construed as impairing any lien or charge on real or personal estate of the decedent which existed at his death."

Accordingly, we hold that the bank was justified in applying the securities it held to the loan.

The bank's position as executor of Mr. Geary's estate did not affect its right to apply the security pledged to it in partial satisfaction of its loan. In Perri v. Chiavaroli, 370 Pa. 495, 500, 88 A. 2d 798 (1952), the court said: "Whatever rights the latter had under the unperformed partnership agreement were inchoate at the time of Perri's death and constituted matter for an Orphans' Court to ponder. The Orphans' Court has exclusive jurisdiction to perform specifically a contract of a decedent . . . which that court will enforce even where the decedent's contractee subsequently becomes his executor . . ."

Accordingly, we will overrule the objection to the bank's action in applying the assets above described to its loan. We will now discuss the specific objections to the charges.

*1. The executor's fee. The Bank's right to charge a fee on the property pledged to it.*

The bank charged an executor's fee of $10,000

and paid its corporate finance department $7,830. Although we hold that the executor had a right to apply the collateral pledged to it against the loan we find that it could not charge the estate a fee on the transaction. In setting its fee, the bank used as a guide five percent on the first $150,000 in assets and four percent on the remainder of the estate. We will deduct from the compensation to be allowed four percent of the amount of the pledged property which is $10,844.33 i.e. the A.T.&T. stock and the checking accounts. The deduction will be $433.

It is the bank's position that the assets here in question were owned by decedent at the time of his death and were administered by it in the same manner as it administered other property; and that it is entitled to be paid for such services. We find, however, that in applying the pledged property to its debt, the bank removed same from the gross estate on which it is entitled to charge a fee.

We have not been able to find any Pennsylvania case in point, but the applicable principle is clearly stated in Linsville's Distributee v. Linsville's Admx., 263 Ky. 499, 92 S.W.2d 800, 802 (1936). In that case the court said:

"The administrix allowed herself 5 per cent commission on all sums of money distributed by her, including that paid to herself. It is a settled rule that administrators are not entitled to a commission on money paid to themselves, and this item should not have been allowed, and the allowance of it by the county court is not conclusive."

Accordingly, this objection to the account will be sustained to the extent indicated.

*The banks' right to charge a commission on the sale of real estate.*

Decedent's real estate was inventoried at $27,300, and the bank included that amount in the gross estate on which it based its charge. The compensation attributable to this asset at four per cent is $1,092. The bank sold the property pursuant to order of court dated August 18, 1975, for $31,000 and charged a broker's commission of seven per cent on the sale, or $2,170. The property was subject to a mortgage in the sum of $20,403.71.

The principal creditors assert that the executor must base its commission on the net sum received by it, i.e., the sale price less the mortgage, and that only one commission may be charged. We find that the executor's fee here may be based on the inventory value of the property. That represents the true worth of the asset.

Brennan's Est., 215 Pa. 272, 64 Atl. 537 (1906), supports our conclusion. In that case trustees sold real estate in the trust and received the gross sale price. They immediately paid part of same to a mortgagee. The lower court held that they were entitled to their commission on the gross sale price. The Supreme Court affirmed on the basis of the lower court's opinion.

The bank is also entitled to a broker's commission. Its position is that a broker's charge would have been proper if an outside party had been employed, and that it still would have been entitled to its commission on the gross value of the estate.

In In re Steed, 40 D. & C. 1 (1940), the syllabus reads in part as follows:

"A corporate trustee who, at the instance of the settlors and life beneficiaries and with the approval of the court and the guardian ad litem for the remainderman, secures a purchaser for real estate constituting the trust res, although the trust

agreement did not contemplate that it would perform any such services, is entitled to a fair and usual commission for the services performed as a real estate broker in addition to its trustee's commissions, especially if the charge was approved by the guardian ad litem and was not objected to by the surviving settlor and life beneficiary at the settlement."

The writer of the opinion in the case, Judge Dannehower of the Orphans' Court of Montgomery County quotes from the Restatement 2d Trusts § 242, comment (d), as follows:

"In the absence of a statute providing a definite rule fixing the amount of the trustee's compensation, a trustee who renders professional or other services not usually rendered by trustees in the administration of the trust, as for example services as attorney or as real estate agent, may be awarded extra compensation for such services. In fixing the amount of such compensation the court will allow an amount which under all the circumstances it considers to represent the fair value of the services."

*The payment by the executor of the fee paid to Michael Cocchiola.*

We find that the bank acted properly in paying this fee. It paid to Mr. Cocchiola $2,160 for his work in preparing tax returns and other accounting tasks for decedent's business. The testimony is to the effect that the services under discussion were required in the settlement of the estate. They are described by Mr. Smith in the testimony of January 13, 1976, p. 107, et seq. The services are clearly worth the amount charged. At the time of

his death decedent apparently had no records of value to the executor. It was faced immediately with the task of filing tax returns for several years prior to decedent's death and it engaged Mr. Cocchiola for these services. There is nothing in the record to indicate that the work was not done or that the charges are exorbitant. The only objection appears to be that these fees should have been absorbed by the executor since it charged a commission for settlement of the estate. We find that the services paid for were necessary in the administration of the estate.

In Zavelle Est., 7 Fiduc. Ref. 638, 641 (1957), decedent's widow objected to the executor's account on the ground it should not have included fees paid to an accountant. In dismissing the objection President Judge Taxis of the Orphans' Court of Montgomery County said: "I conclude that the executors were justified in hiring this accounting firm to clear up many errors and discrepancies, not only in an effort to properly and accurately administer this estate but in addition in an effort to eliminate the acrimonious family arguments concerning the management of this business."

For the same reasons we find that the bank was justified in paying $7,830 to its corporate finance department.

*Should the bank be held responsible for the delay in liquidating assets?*

The above discussion indicates that this question must be answered in the negative. The executor could not have operated the business without further losses. It liquidated the assets in

the estate as promptly as possible and at as high a price as could be secured. The objections to the account on this ground will be dismissed.

2. *Is the attorney fee excessive?*

The attorneys ask for payment to them for services to the estate in the sum of $12,139.95. This was increased by $1,500.10 after the first bill rendered for $10,639.85 as shown in the second and final account filed October 31, 1975. The breakdown of the claim is as follows:

| | | |
|---|---|---|
| April 25, 1974 to February 28, 1975 | | 123.7 hours |
| February 28, 1975 to October 21, 1975 | | 85.17 hours |
| October 21, 1975 to January 12, 1976 | | 30. hours |
| | Total | 238.24 hours |

At $50 per hour this amounts to $11,912. The small difference between this and the sum charged is attributable to cash expended by the attorneys.

The statements submitted outline the activities consuming the time, such as telephone conferences, meetings and preparation of papers, but they do not state how much time was spent on each item listed. The fee charged represents a substantial percentage of the inventory value of the estate, and of the balance for distribution. As noted above we have reduced this from $12,139.95 to $10,139.95.

Counsel for Westinghouse has made this point, that the proceeds of the sale of the business assets should not be considered a part of the estate. If this is so, then the executor and counsel are not entitled to compensation for administering some

$90,000 of the assets now being distributed. While there is some merit to this argument, we cannot adopt it. Westinghouse had made a claim to the business inventory. This included some boats against which Westinghouse had a lien. At the time of decedent's death, Cambro, Inc. claimed a lien on the same assets and Molded Fiber Glass demanded that seven of the boats on the premises be returned to it. The executor had the duty of determining the merits of these claims and protecting the rights of the preferred and general creditors. We find that the executor acted properly in selling the assets and relegating the creditors to the fund which the sale produced.

Section 711 of the P.E.F. Code, 20 Pa. C.S.A. §711, provides that: ". . . the jurisdiction of the court of common pleas over the following shall be exercised through its orphans' court division.

". . .

"(17) Title to personal property. The adjudication of the title to personal property in the possession of the personal representative, or registered in the name of the decedent or his nominee, or alleged by the personal representative to have been in the possession of the decedent at the time of his death."

In Ambler Nat'l. Bank v. Siesel's Est., 59 D. & C. 527 (1947), the court sustained preliminary objections to an action in replevin against an executrix for recovery of two airplanes. These were subject to a chattel mortgage. The court sustained the preliminary objections and quashed the writ of replevin, saying:

"This rule [that the administrator is entitled to take immediate possession of all of decedent's per-

sonal effects without exception] appears to be so absolutely essential to the expeditious and uniform settlement of estates that it should be held to be inviolate. This is particularly true since the recent statutory recognition and general use of chattel mortgages. Any other rule would lead to inextricable confusion, uncertainty, delay and multiplied litigation . . . Such a decision should in no way prejudice the mortgagee creditor inasmuch as it will still have its claim upon distribution of the estate and will then have an opportunity to assert any priority of claim to the fund to which it believes it is to be entitled . . ."

Accord: Crisswell's Est., 334 Pa. 266, 5 A.2d 577 (1939).

It is clear that in the case at bar the orphans' court division had jurisdiction over the inventory in decedent's business. It follows that it was the executor's duty to administer these assets. Subject to what we have determined above concerning reduction of said fees we find that the executor and the attorney may fix their compensation on the assets within the jurisdiction of the court.

In their brief, the attorneys for the estate suggest that an additional fee of $1,000 is in order because of their services since the audit. We cannot allow further compensation. They represent the executor. It has filed its account. It is the duty of the court now to distribute the estate to the creditors. The executor and the attorneys are among these. In their brief the attorneys argue in part in support of their compensation and that of the bank. They cannot be paid from the estate for these efforts. The other creditors must pay their counsel for their attempts to establish their posi-

tion. It would be different if the estate were pursuing additional assets. In such a case there would be justification for additional compensation.

3. *The claim of Cambro, Inc., landlord to decedent.*

This claim is for a total of these items:

Rental to date of death, April 25, 1974
   at $1,100 per month         $5,316.50
From December, 1974 through May,
   1975         6,600.00
Destruction of hoist on the premises   1,900.00

We will treat the last item first, that is, the matter of the hoist. This cannot be allowed. It appears that Mr. Campbell's only complaint, he being the owner of Cambro, Inc., is that the hoist was removed. It was, however, the property of Mr. Geary. In notes of testimony taken October 28, 1974, page 55 et seq. Mr. Campbell described the circumstances under which he believes that he is entitled to reimbursement in the sum of $1,900. He said that there was an opening in the ceiling between the first floor and the floor of the second story of the building. Through this aperture merchandise was removed from the first to the second floor. Mr. Campbell said, page 57, that there were two hoists on the premises and that it would cost $900 per unit to replace them. On page 59, he said: "the hoists were the property of Mr. Geary."

On page 58, he stated the basis of his claim for damages:

"Q. Mr. Campbell, you mentioned the hoists that were removed from the property. It was suggested in the testimony, or offered as proof by your counsel, that damage had occurred to the

building, the structure itself. Will you please explain to me how damage was caused by the removal—

"A.  It eliminated the availability of raising material by mechanical means, electrical motors, from the first floor to the second floor."

It appears that what Mr. Campbell said is perfectly true, that is, that the hoists were worth $1,800 and were necessary for the conduct of the business of Mr. Geary on the premises. However, it was not demonstrated that the hoists were "fixtures" and that title to same vested in the landlord. Mr. Campbell conceded that the hoists were the property of Mr. Geary. Accordingly, the evidence will not support his claim for damages for removal of these articles.

*The landlord's claim for rent must also be denied.*

We will first consider the claim for rent for the period from December 1, 1973 to the date of death, April 25, 1974, totaling $5,316.50.

The P.E.F. Code, 20 Pa. C.S.A. §3392, provides that a landlord shall have priority over general creditors for "[r]ents for the occupancy of the decedent's residence for six months immediately prior to his death."

Since the rent in the case at bar is claimed for a business property this section is not applicable.

Cambro's counsel points to section 3381 which provides that:

"Nothing in this code shall be construed as impairing any lien or charge on real or personal estate of the decedent which existed at his death."

He argues further that the Act of June 16, 1836,

P.L. 755, sec. 83, 68 P.S. §321, creates a lien in his favor. The section reads as follows:

"The goods and chattels being in or upon any messuage, lands, or tenements, which are or shall be demised for life or years, or otherwise taken by virtue of an execution, and liable to the distress of the landlord, shall be liable for the payment of any sums of money due for rent at the time of taking such goods in execution: Provided, That such rent shall not exceed one year's rent."

The Act of May 7, 1929, P. L. 1589, as amended, 68 P. S. §322, provides that when goods "upon which there is at the time a distress for rent" are sold on execution, the distress shall be stayed and the landlord shall be first paid out of the proceeds of the sale. However, section 404 of the Landlord and Tenant Act of April 6, 1951, P. L. 69, 68 P. S. 250.404, exempts certain personal property located on the leased premises from levy and sale on distress for rent. It provides that:

"The following personal property located on premises occupied by a tenant shall be exempt from levy and sale on distress for rent, i.e., personal property—

". . .

"(5) Of a decedent."

Therefore, the Act of 1836 is not applicable since the goods in the case at bar were not "liable to the distress . . ." The Act of 1929, referred to above seems to apply only to a receiver in equity or a trustee or receiver in bankruptcy, and not to an executor of a decedent's estate. In any event, it is clear that the Act of 1929 is inapplicable for the reason that at the time of decedent's death, and at the times of the sales by the executor, there was no "distress for rent" in existence. Accordingly,

the landlord's claim for preferred status as to his claim for rent prior to decedent's death must be denied.

Cambro's claim for rent for the period from December, 1974, through May of 1975 in the sum of $6,600, is based on the assumption that this is the executor's obligation, that it must be included in "costs of administration," and is, therefore, entitled to priority. We cannot agree. The executor paid Cambro for the period during which it occupied the premises. It had no contractual relation with Cambro. It is true that the lease provides that it shall be binding on Geary's executor. A claim under the lease is, however, only a general claim against the estate. This is so even though the executor gave to Cambro only a few days notice of its intent to vacate. The executor can be held only for use and occupancy. Once the executor vacated the premises the landlord is relegated to his lease for further recovery. He is entitled to enter a claim against the estate for his loss but this is a general and not a preferred claim. Wacker's Est., 37 D. & C. 330 (1939), supports our decision on this point.

The landlord's case is not aided by two clauses in the lease, one waiving the provisions of the Landlord and tenant's act, and the second, assigning all goods on the premises as security for the rent. The landlord cannot by his agreement with the tenant promote his status as a creditor to rank with others who have liens on decedent's property which precede that of the landlord.

4. *The claim of Westinghouse Credit Corporation.*

This creditor has a first lien on the inventory of

decedent's business. Accordingly, it will be paid the full amount of its claim.

Westinghouse is afforded a "security interest" in the inventory of Motor Boat Sales and Service by The Uniform Commercial Code of April 6, 1953, P. L. 3, sec. 9-101, as amended, 12A P. S. §9-101 et seq. Section 9-102 of the code provides that it applies to any transaction which is intended to create a security interest in personal property. There are certain exceptions to this provision, but they are not material here. Section 9-401 of the code provides for the filing of a security interest in the office of the Secretary of the Commonwealth and in the offices of the prothonotary of the county where the personalty is filed. When it is filed it becomes "perfected" under section 9-302 and thus, entitled to priority over "unperfected" liens. Accordingly, Westinghouse had a lien on all inventory of Geary's business and is entitled to be paid first from the proceeds of the sale of said inventory. No other creditor has a superior or equal right in the fund. Cambro, Inc. has no lien and no right to a preference as is hereinabove demonstrated. Molded Fiber Glass has an unperfected security interest in the proceeds of sale of its boats. Its rights are subordinate to those of Westinghouse in said property.

Westinghouse will be allowed the face amount of its claim which is $54,700.19. It claims additional interest after the date of decedent's death to December 15, 1975, in the sum of $2,602.29 plus interest from and after said date at the rate of $18.56 per day. It also asks for counsel fees in the sum of $2,044.

We find that the creditor is entitled to interest only to the day of decedent's death and not thereaf-

ter since this estate is insolvent. See Strassburger Est., 48 D. & C. 634 (1943).

It is clear too, that in a case of an insolvent estate the creditor must pay its own attorney fees. See Biddle Est., 57 Montg. 4 (1940). Attorney's fees have been allowed when the efforts of counsel have enhanced the estate. In this case, however, counsel for Westinghouse confined its efforts to its own client's interest. Accordingly, its claim for counsel fees will not be allowed.

5. *The claim of Molded Fiber Glass Company.*

On June 22, 1973, Molded Fiber Glass entered into a contract with Geary, whereby it sold seven boats to Geary. The buyer gave to the vendor a security interest in the merchandise and the boats were delivered. The security interest was not recorded.

Molded Fiber Glass's claim is for $9,060.19. From this must be deducted invoice #1566 as appearing on Molded Fiber Glass's claimant's exhibit #2 for interest subsequent to date of death in the sum of $285.93 and one·month's interest from invoice #1769 in the sum of $90.61, this also being interest accrued subsequent to the date of Mr. Geary's death. The balance is $8,683.65. It is entitled to this sum. Its boats were inventoried at $13,200 (Cambro Exhibit C). The inventory of all business assets amount to $130,400, and this was sold for $90,493.24 (See first and partial account filed on January 3, 1975). Thus, the various sales produced only 67.5 per cent of inventory value. It must be assumed that there was that percentage of loss on Molded Fiber Glass's collateral. 67.5 per cent of $13,200 is $8,910. This is more than sufficient to cover the balance due on Molded Fiber Glass's claim and it will be allowed in full.

Section 9-201 of the Uniform Commercial Code, 12A P. S. § 9-201 provides that:

"Except as otherwise provided by this Act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors."

This gives to Molded Fiber Glass priority over all creditors except the executor and the attorneys. Their services were related to the fund produced by the sale and must be paid first from the proceeds. As to other creditors, however, their rights in the fund are subordinate to those of Molded Fiber Glass. Said creditors derive their rights from the executor. The pertinent provisions of the U.C.C. 12A. P. S. § 9-301, provide that:

". . . an unperfected security interest is subordinate to the rights of
". . .
"(b) a person who becomes a lien creditor without knowledge of the security interest and before it is perfected;
". . .
"(3) A 'lien creditor' means a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes an assignee for benefit of creditors from the time of assignment and a trustee in bankruptcy from the date of the filing of the petition or a receiver in equity from the time of appointment." (Emphasis supplied.)

An executor is not included in the list of those to be considered as "lien creditors." In *Estate of Hinds,* 10 Cal. App. 3d 1021, 89 Cal. Rptr. 341 (1970), the court considered the provisions of U.C.C. 9-301 above quoted. In a situation similar

to that existing here the court said, 10 Cal. App. 3d at p. 1025:

"Here, the Hind's Estate admittedly was insolvent. If it be conceded that, under such circumstances, an executor or administrator is authorized to act in some fiduciary capacity for creditors, that concession would not make them lien creditors nor would it transform the administrator into a 'receiver in equity.' . . . Had the Legislature intended to broaden its definition of 'lien creditor' to include not only receivers in equity but also to include executors and administrators of involvent estates, it easily could have said so, but did not."

The conclusion herein is in accord with De Peio Est., 13 FIDUC. REP. 88 (1962). See also, Graham v. Graham Admx., 306 S.W. 2d 831 (C. A. Ky. 1957).

## Conclusion

The balance for distribution according to the supplemental petition for distribution is $96,790.93. To this must be added $1,187 due from Century Boat Company and $4,317.58 due from Mr. Georges, according to the petition for distribution; also, $433, the amount of the surcharge against Pittsburgh National. The total will be $102,729.41. This will be distributed as follows:

| | |
|---|---:|
| To counsel for the estate | $ 10,139.95 |
| To Pittsburgh National Bank | 7,969.37 |
| To Pittsburgh National Bank Corporate finance department | 7,830.00 |
| To Westinghouse Credit Corporation | 54,700.19 |
| To Molded Fiber Glass Company | 8,683.65 |
| To the preferred claims | 13,406.25 |
| Total | $102,729.41 |

An order will be made disposing of the objections filed herein and a decree entered distributing the assets in the estate in accordance with the priorities determined.