264 A.2d 334.

STATE TERMINAL CORP. *vs.* GENERAL SCRAP IRON, INC. *et al.*

GENERAL SCRAP IRON, INC. *et al. vs.* STATE TERMINAL CORP.

APRIL 20, 1970.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. These two civil actions concern the litigants' rights to the use and possession of certain waterfront property located in the City of Providence. State Terminal Corp. is a Florida corporation authorized to do business in this state. General Scrap Iron, Inc. and Metals Processing Company are Rhode Island corporations. Hereafter we shall refer to the Florida corporation as "State Terminal" or the "appellant," and the Rhode Island corporations as "General Scrap." The cases are before us on the appeals of State Terminal from adverse judgments entered against it in the Superior Court after a jury-waived trial. The cases were consolidated in that court, and we have consolidated the appeals.

Appeal 710 concerns a civil action wherein State Terminal sought to enjoin its eviction from certain docking facilities referred to as State Pier No. 1. This property is located along the westerly bank of the Providence River. Appeal 712 embraces a money judgment for $400 entered in favor of General Scrap. This sum was awarded as damages against State Terminal for its use and occupation of the aforedescribed premises.

State Terminal specialized in the business of shipping bulk cement into Rhode Island by boat, storing it at dockside and then distributing this product throughout New England. On July 17, 1962, the State of Rhode Island leased a portion of State Pier No. 1 to appellant for a period of 10 years beginning August 1, 1962. The lease called for the payment of an annual rental of $11,000—payable quarterly in advance. If the rent was not paid

within 15 days after it was due, the lease could be terminated.

The record shows that appellant's unloading process created a cement-dust nuisance. Cement dust settled on the dock and the structures located nearby. The moisture in the air combined with the dust to leave a solid cement crust on the pier and various buildings. This condition caused the Navy which berthed its vessels on the southerly side of the pier to complain to the state authorities. Several conferences between State Terminal, the Navy, and various state officials followed. State Terminal agreed to adopt new unloading techniques. The dust continued to fall and harden. The Navy vacated its part of the pier. State Terminal then agreed to install new machinery which supposedly guaranteed a dust-free unloading of a ship's cargo.

Before the new equipment arrived in Providence, State Terminal ceased its operations at the dock. It also stopped paying the rent as of February 1, 1966. The appellant complained to the Director of the Division of Harbors and Rivers that the cost of purchasing the new equipment made it impossible for it to make the quarterly rent payments. On October 17, 1966, the Division demanded the immediate payment of the back rent, which at that time amounted to $8,250. The appellant's reply to this demand told of its financial stress and asked the "indulgence" of the state.

Finally, on June 22, 1967, the Director of the Department of Natural Resources notified State Terminal that its lease was terminated because of its failure to pay the rent. The total amount of the rent then due and owing the state was $16,500. Shortly thereafter, State Terminal tendered its check for a portion of this amount, but the check was refused.

In the meantime, General Scrap was conducting a scrap

metal business along the northeasterly bank of the Providence River on a parcel of land known as India Point. There is evidence to show that there had been several attempts in the past to purchase the scrap iron yard and convert it into a public park. Certain state officials, aware of their problems at the state pier and cognizant of the desire to establish a recreational area on the easterly side of the river, consulted with the owners of General Scrap. The properties were appraised as being of equal value. Since no money was available for the purchase of India Point, the state and General Scrap agreed to a land swap. Accordingly, on April 16, 1968, India Point was exchanged for State Pier No. 1. A quit-claim deed duly signed by the Governor and the Director of the Department of Natural Resources conveyed the state pier property to General Scrap and General Scrap conveyed India Point to the state. Thereafter, General Scrap, as it sought to establish its possession of the pier facilities, found itself immersed in this litigation.

In its appeal, State Terminal poses two issues: It argues that the Superior Court should have enjoined its eviction on the grounds that the State of Rhode Island should have been estopped from terminating its lease because of the conduct of state officials, and it also contends that General Scrap never acquired proper title to State Pier No. 1 that would enable it to maintain an action against appellant for the use and occupation of the premises.

## I

### Estoppel

In the action where it sought equitable relief, State Terminal claims that the Director of the Division of Harbors and Rivers was cognizant of the corporation's fiscal problems and that an understanding was reached whereby the rent would be deferred pending the resumption of its load-

ing operations. Recently in *Ferrelli* v. *Department of Employment Security,* 106 R. I. 588, 261 A.2d 906, we observed that there is a growing recognition that the doctrine of estoppel may be invoked against a public agency. However, there is no need to consider whether the doctrine should be employed against the state here because the trial justice declared that there was absolutely no proof of any understanding relative to any rent moratorium or modification of the lease. We see no reason to disturb this finding.

## II

### The 1968 Conveyance

To place appellant's attack on the state conveyance in its proper light, it is necessary that we review the state's ownership of the waterfront property. The state pier premises were acquired by the state pursuant to the provisions of P. L. 1910, chap. 568. This act authorized the State Harbor Improvement Commission to acquire land lying on the waterfront for the benefit of the citizenry. The commission was authorized to lease some of the acquired property to private enterprise and retain the balance for the transportation needs of the public. The acquisition of this land was financed by the issuance of bonds authorized by P. L. 1910, chap. 589.

The appellant points to the fact that the state-owned land was devoted to a public use. It concedes that the General Assembly may authorize the sale or other disposition of land which has been devoted to a public use. The appellant takes the position that, when the legislature at its 1969 session enacted legislation ratifying and confirming the 1968 conveyance to General Scrap, its action was a nullity because of a failure to comply with the provisions of art. IV, sec. 14 of the Rhode Island constitution. This section states that any bill appropriating public money or property for a local or private purpose must be passed by

two-thirds of the elected membership of each house[1] of the General Assembly.

General Scrap conceded in oral argument that its title to the property and its right to the $400 money judgment rests on the validity of the legislature's confirmatory action. This appeal, therefore, affords us an opportunity to review various rulings made by this court on different attacks which have been made over the years upon the procedure whereby a legislative act has become the law of this state.

In *State* v. *Septon*, 3 R. I. 119, this court embraced what is known as the Enrolled Bill Doctrine. Under the "enrolled bill rule" a duly authenticated, approved, and enrolled bill is conclusive proof as to the regularity of its enactment, and courts are precluded from examining this issue. *Opinion of the Justices,* Del., 232 A.2d 103. The basis of the rule is that the record of the enrolled bill imports absolute verity. This principle is convenient in that it obviates any inquiries such as the one presently being made by appellant.

Later in *O'Neil* v. *Demers*, 44 R. I. 504, 118 A. 677, there was a departure from the principle set forth in *State* v. *Septon, supra.* In *O'Neil,* it was pointed out that art. IV, sec. 8 of the state constitution requires each house of the General Assembly to keep a journal of its proceedings. Accordingly, this court declared that, when a question arises regarding the validity of an enrolled act which involves a determination of the regularity of the enactment of a law, the courts might examine legislative journals. This pronouncement indicated that the court had em-

---

[1]Article IV, sec. 6 of the Rhode Island constitution states that a majority of each house shall constitute a quorum to do business. The Senate consists of 50 members. The House is composed of 100. To conform to the constitutionally required two-thirds vote, there must be at least 34 Senators and 67 Representatives voting in favor of any bill coming within the purview of art. IV, sec. 14.

braced a rule of law described in several other jurisdictions as the "journal entry rule." This rule provides that the legislative journals may be examined in order to ascertain whether there has been compliance with the constitutional prerequisites to the enactment of a law. *State ex rel. v. Naftalin*, 246 Minn. 181, 74 N.W.2d 249.

Again, in 1961, the justices of this court in *Opinion to the Governor*, 92 R. I. 489, 170 A.2d 284, advised the chief executive relative to certain legislation then pending in the General Assembly which called for the rebate by the state of license fees previously paid by certain motor vehicle operators. The Governor was informed that if this legislation was intended to obligate the General Treasurer to make the individual disbursements provided therein, the legislative records had to show that the bill passed each branch of the General Assembly by the constitutionally prescribed vote called for by art. IV, sec. 14.

In *Moore v. Langton*, 92 R. I. 141, 147, 167 A.2d 558, 561, can be found the following excerpt from 1 Cooley, *Constitutional Limitations* (8th ed.), at 277:

> " 'Each house keeps a journal of its proceedings, which is a public record, and of which the courts are at liberty to take judicial notice. If it should appear from these journals that any act did not receive the requisite majority, or that in respect to it the legislature did not follow any requirement of the constitution, or that in any other respect the act was not constitutionally adopted, the courts may act upon this evidence, and adjudge the statute void.' "

While we give all due deference to the legislature as a coordinate branch of government, it is our solemn obligation to determine whether the act now before us was enacted in pursuance to the provisions of our constitution. Accordingly, we have, in our quest for an answer to this question, taken judicial notice of the legislative journals for the January 1969 session of the General Assembly.

The bill confirming the conveyance to General Scrap was designated as Senate Bill No. 626 (hereafter called S 626). It passed the Senate on April 30, 1969. The Senate Journal for that day shows that the roll was called "in part" and then on the suggestion of Senator Sgambato, and with the unanimous consent of the Senate, further reading of the roll call was dispensed with and a quorum declared present. The Senate record states the passage of S 626 was moved, seconded and "by unanimous consent, read and passed, under suspension of the rules." The bill received concurrent passage in the House of Representatives on May 7, 1969. The House Journal for that day discloses that by unanimous consent the call of the roll was dispensed with and that a quorum was declared present. The legislative record further shows that S 626 was passed in concurrence on "a voice vote." There is nothing in either journal to show that the required two-thirds of each house approved the bill. However, on May 9, 1969, each branch of the General Assembly passed House Bill No. 1731 (hereafter called H 1731). This was a resolution appropriating $15,000 to a private nonbusiness corporation, called Opportunities Incorporated. The money was given to assist the corporation in its operation of a home for "pre-delinquent youths." The legislative journals show that this bill passed the House on a division vote "67 members voting in the affirmative and 0 members voting in the negative," and it passed in concurrence in the Senate on a division vote "46 Senators voting in the affirmative and 0 Senators voting in the negative."

The legislature's actions in giving the constitutionally required two-third's approval to the money given Opportunities Incorporated is convincing evidence that the members of the General Assembly, when passing an act which unquestionably appropriates public funds or property for a private purpose, are cognizant of their duty un-

der art. IV, sec. 14. When we contrast the silent record of the Senate Journal of April 30, 1969, and the House Journal of May 7, 1969, with the affirmative record of the legislative journals of May 9, 1969, it is obvious that S 626 did not receive the requisite approval of two-thirds of the elected membership of each branch of the legislature. In our opinion, the legislature's omission may be traced to a doubt on its part as to whether the confirmatory bill comes within the provisions of art. IV, sec. 14. While General Scrap's sense of civic responsibility is most laudatory, we are of the opinion that the conveyance of the state pier is an appropriation of public property for a private use which must be approved by the necessary constitutional majority. Furthermore, whatever past legislative practices might have been, it is our considered judgment that in the future where public funds or property are being appropriated to a private purpose, it should appear on the face of each journal that the bill was passed in conformity with the requirements of the constitution.

In Appeal 710, the plaintiff's appeal is denied and dismissed.

In Appeal 712, the defendant's appeal is sustained; the judgment appealed from is vacated, and the case is remitted to the Superior Court for entry of judgment for the defendant.

*Smith & Smith, Z. Hershel Smith,* for plaintiff-appellant, State Terminal Corp.

*Charles F. Cottam, Avram Cohen, George Ajootian,* for defendants-appellees, General Scrap Iron, Inc. and Metals Processing Company.