INDEPENDENT COMMUNITY BANK-
ERS ASSOCIATION OF SOUTH DA-
KOTA, INC.; Professional Insurance
Agents of South Dakota; South Dakota
Association of Life Underwriters; and
the Independent Insurance Agents of
South Dakota, Inc., Plaintiffs and Ap-
plicants,

v.

STATE of South Dakota; By and
Through its Attorney General, Honora-
ble Mark V. MEIERHENRY, Defendant
and Respondent.

No. 14288.

Supreme Court of South Dakota.

Argued Jan. 16, 1984.

Decided March 28, 1984.

Rehearing Denied April 27, 1984.

Ronald G. Schmidt of Schmidt, Schroyer, Colwill & Zinter, Pierre, for plaintiffs and applicants.

Mark A. Moreno, Asst. Atty. Gen., Pierre, for defendant and respondent; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

MORGAN, Justice.

This is an original proceeding under SDCL ch. 15–25 wherein Independent Community Bankers Association of South Dakota, Inc.; Professional Insurance Agents of South Dakota; South Dakota Association of Life Underwriters; and the Independent Insurance Agents of South Dakota, Inc. (plaintiffs) challenge the constitutionality of SB 256/1983 (afterwards enrolled as Chapter 356 of the 1983 Session Laws), hereinafter referred to as SB 256 or as the bill, as violative of four requirements of the South Dakota Constitution: (1) that no law shall embrace more than one subject which shall be expressed in its title; (2) that every bill shall be read twice by number and title, once when introduced and once upon final passage; (3) that the legislature may not improperly delegate its authority nor pass vague or uncertain laws; and (4) that the legislature must comply with due process requirements of the South Dakota Bill of Rights when enacting laws. We disagree and conclude that the legislature did not violate the constitution or laws of South Dakota in the enactment of SB 256.

We note first the brief history of the enactment of SB 256. The Senate convened on Friday, March 4, 1983, and a motion was made to suspend the rules for the purpose of introducing and placing SB 256 on the Senate calendar for that day under Second Reading of Senate Bills. The motion carried by two-thirds of the elected members. SB 256 was then introduced and read for the first time. Later that day, the bill was read a second time, and voted upon. The bill did not receive an affirmative vote from two-thirds of the members-

elect, and thus failed to pass. A motion to reconsider SB 256 later that day prevailed however, and upon reconsideration, the bill passed and the title was agreed to.

The House received SB 256 the same day the bill passed in the Senate and a motion was made to suspend the rules for introduction, first reading, referral to committee and placement of SB 256 on the day's calendar. The motion likewise carried by two-thirds of the elected members. The bill was later read by number and title "the second time" (House Journal, page 1205), voted upon and passed by two-thirds majority of the House members-elect.

Both houses of the legislature found the bill properly enrolled and the Speaker of the House and the President of the Senate each read the bill publicly and signed it before their respective chambers. The Senate delivered the bill to the Governor at 5:47 o'clock p.m. on March 4, 1983, the day it was first introduced. The Governor signed the bill at that time and it went into effect immediately as a result of the emergency clause incorporated therein.[1]

■ Any legislative act is accorded a presumption in favor of constitutionality and that presumption is not overcome until the unconstitutionality of the act is clearly and unmistakenly shown and there is no reasonable doubt that it violates fundamental constitutional principles. *South Dakota Ass'n, Etc. v. State, Etc.*, 280 N.W.2d 662 (S.D.1979). Legislative action is also accorded a presumption in favor of validity and propriety and no statute should be held unconstitutional by any court unless its infringement of constitutional restrictions is so plain and palpable as to admit of no reasonable doubt. *Clem v. City of Yankton*, 83 S.D. 386, 160 N.W.2d 125 (1968).

We first examine plaintiffs' contention that SB 256 violates Art. III, § 21, of the South Dakota Constitution which provides in essence that "[n]o bill [1] shall embrace more than one subject, [2] which shall be

---

**1.** There is some dispute as to exactly when SB 256 was filed in the office of the Secretary of State; however, we deem it immaterial to our considerations here.

expressed in the title." The title of SB 256 reads:

"AN ACT to revise the provisions for ownership, powers, operation and taxation of certain banks and their subsidiaries and to declare an emergency."

This court reviewed the application of Art. III, § 21, in *McMacken v. State*, 320 N.W.2d 131, rehearing 325 N.W.2d 60 (S.D. 1982), and reiterated the court's holding in *State v. Morgan*, 2 S.D. 32, 48 N.W. 314 (1891). The court looked at the purpose for the constitutional provision as it was presented in *Morgan*:

(1) prevent combining into one bill several diverse measures which have no common basis except, perhaps, their separate inability to receive a favorable vote on their own merits; (2) prevent the unintentional and unknowing passage of provisions inserted in a bill of which the title gives no intimation; and (3) fairly apprise the public of matters which are contained in the various bills and to prevent fraud or deception of the public as to matters being considered by the legislature.

320 N.W.2d at 138. The first purpose given for this constitutional provision is the basis for the one-subject requirement. The second and third stated purposes for the provision are grounds for the second requirement of Art. III, § 21; the one subject embraced within every law shall be expressed in its title. S.D.Const. art. III, § 21.

Plaintiffs first contend that the bill violates the requirement that it shall not embrace more than one subject, inasmuch as SB 256 refers only to "banks" while the eight sections of the bill deal with a variety of subjects, including bank holding companies, insurance, taxation of insurance companies, the sale of banks, and a filing fee. Plaintiffs point to the fact that the bill amends at least six different sections of the South Dakota Codified Laws as evidence that the bill encompasses more than one subject.

We disagree, however, inasmuch as each section of SB 256 is easily subsumed within the general subject of the bill, which is the regulation of "certain banks and their subsidiaries." The subject of a law is "the public or private concern for which the law is enacted, and all provisions of the Act must relate directly to the same subject, have a natural connection, and not be foreign to the subject as stated in the title." *McMacken*, 320 N.W.2d at 138. The concern for which SB 256 was enacted was the regulation, e.g., "ownership, powers, operation and taxation" of banks and their subsidiaries, e.g., insurance companies, and each section of the bill relates directly to that concern.

Section one is an emergency clause which presents the economic conditions which spawned the bill and outlines the bill's anticipated effect on the state's economy. Section two allows out-of-state bank holding companies to more readily acquire greater interests in South Dakota banks and thus regulates the ownership of banks. Section three prohibits banks acquired pursuant to section two from operating to the detriment of existing banks or insurance companies and subjects banks and their subsidiary insurance companies to the laws and regulations that govern the traditional insurance industry. This section goes to the "powers" and "operation" of banks which enter the insurance business under section five. Section four revised two of the four criteria upon which acquisition and formation of banks, pursuant to section two, will be permitted and imposed a fee upon those acquisitions and formations. This section deals directly with the ownership and taxation of banks and is clearly embraced within the subject of the title. Section five empowers banks, including banks acquired or formed under section two, to participate, either directly or through subsidiaries, in the insurance business. This section amends the statutory powers and permissible operations of banks and their subsidiaries. Bank powers and operations fall directly under the regulation of banks and their subsidiaries, the clearly stated general subject of SB 256. Sections six and seven, respectively, subject banks and insurance companies to both

the retail occupational sales tax and the use tax on tangible personal property. The title affords notice that SB 256 revises provisions for the taxation of banks and their subsidiaries and these sections are embraced by the general subject of the bill in that taxation is part of the regulation of banks and their subsidiaries. Section eight is another emergency clause and gave the bill force and effect upon approval.

◼ This court stated in *State v. Youngquist,* 69 S.D. 592, 594, 13 N.W.2d 296, 297 (1944), that the subject of a statute "is singular when a number of things constituting a group or class are treated as a unit for general legislation." Each of the eight sections of SB 256 has a natural connection with the regulation of banks in the insurance business and no section of the bill is foreign to that subject as it is stated in the title. *See State v. Morgan, supra.* In a line of cases led by *Morgan, supra,*[2] this court held that while the subject must be single, provisions to accomplish the objective of an act may be multifarious. *State v. Morgan, supra.* Art. III, § 21 of our Constitution controls only the subject of an act, limiting all acts to one subject expressed in the title. Art. III, § 21, does not require that the title index the contents of an act. *Clem v. City of Yankton, supra.* There is no restriction on the scope of a single subject provided it is encompassed by the title. *State v. Morgan, infra.* "The provisions of the act must all relate directly to the same subject, have a natural connection, and not be foreign to the subject as stated in the title." 2 S.D. at 42, 48 N.W. at 317. "When the title of a legislative act expresses a general subject or purpose which is single, all matters which are naturally and reasonably connected with it, and all measures which will or may facilitate the accomplishment of the purpose so stated, are germane to its title." *Id.* The constitutional requirement is fulfilled if the provisions of the act relate to the subject. "They must be parts of it,

incident to it, or in some reasonable sense auxillary (sic) to the object in view." *Id.* "It is sufficient if the language used in the title, on a fair construction, indicates the purpose of the legislature, so that making every reasonable intendment in favor of the act it may be said that the subject of the law is expressed in the title." *Id.*

◼ In *State v. Youngquist, supra,* this court implied that where similar subjects are properly grouped and treated by the legislature as a class, the constitutional requirement is met. Sound policy and legislative convenience dictate a liberal construction of title and subject matter. *South Dakota Ass'n, Etc. v. State, Etc., supra.*

We next look at the second requirement that the title must express the subject comprehensively enough to include all the provisions of the act. *See State v. Morgan, supra.* The test of whether a bill's title adequately expresses its subject was set out in *McMacken v. State, supra,* "[t]he central question is: Does the title put a person on notice of a germane subject in the body of a statute? 'When the title is general, as it may be, all persons interested are put upon inquiry as to anything in the body of the act which is germane to the subject expressed[.]' " 320 N.W.2d at 139. The title to SB 256 expresses the subject of the statute, which is the regulation and taxation of banks and their subsidiaries, including insurance companies. The bill primarily deals with insurance only as the insurance industry overlaps with the banking industry and more specifically as banks enter the insurance industry either directly or indirectly through their subsidiaries.

◼ The references to "bank holding companies" and "insurance companies" found in the Act are not beyond the scope of the single subject found in the title. Bank holding companies are typically involved in ownership and acquisition of

---

**2.** *State v. McPherson,* 30 S.D. 547, 139 N.W. 368 (1913); *Cowell v. Lewis,* 52 S.D. 229, 217 N.W. 218 (1927); *South Dakota Ass'n, Etc. v. State, Etc.,* 280 N.W.2d 662 (S.D.1979); *McMacken v. State,* 320 N.W.2d 131 (S.D.1982); and *Clem v. City of Yankton,* 83 S.D. 386, 160 N.W.2d 125 (1968).

banks and are encompassed by the general terms of the title which refers to "the ownership ... of certain banks and their subsidiaries ...." The section which refers to the insurance industry is embraced by the title provisions which refer to "ownership, powers, operation and taxation of certain banks and their subsidiaries." The provisions for a filing fee and taxation of banks and the insurance industry are also covered by the general subject expressed in the title. Tax provisions included in general legislation for regulation of a particular business or industry do not have to be disclosed in the title. *State v. Morgan, supra; City of Pierre v. Siewert,* 63 S.D. 485, 261 N.W. 42 (1935). The title of SB 256, however, clearly discloses that the bill revises provisions concerning "taxation of certain banks and their subsidiaries."

In applying the general principles and rules of construction pertinent to Art. III, § 21 of our Constitution, to SB 256, it is important to remember this court's admonition in *State v. Morgan, supra:*

> [T]he provision of the constitution is mandatory; that is, that no law shall embrace but one subject, which shall be expressed in its title. Yet in cases not clearly within the mischief intended to be remedied by requiring the subject of an act to be single, and to be expressed in the title, legislation will not be. adjudged void on any nice or hypercritical interpretation. Sound policy and legislative convenience dictate a liberal construction of title and subject matter.

2 S.D. at 43–44, 48 N.W. at 318. *See McMacken,* 320 N.W.2d at 138–39. Objections to an act on the basis that it embraced more than one subject and was not adequately expressed in its title should be grave, and the conflict between the statute and the constitution plain and manifest, before it may be justifiably declared unconstitutional and void. *Morgan, supra.* We find no violation of Art. III, § 21 of the South Dakota Constitution.

The second issue involves Art. III, § 17 of the South Dakota Constitution and the requirement that "[e]very bill shall be read twice by number and title once when introduced, and once upon final passage ...." S.D. Const. art. III, § 17. It is important to recognize in considering this issue that Art. III, § 9 of the South Dakota Constitution provides that each house of the legislature shall establish the rules for its proceedings. On January 19, 1983, the House and the Senate adopted rules for the 1983 Session, including a rule requiring reference of bills and resolutions to one of the standing committees (House Rule 3–3 and Joint Rule 6–13), and a provision that a motion to amend, to adopt or to suspend the rules of a respective body required a two-thirds majority of the members elect (Senate Rule 8–1 and House Rule 4–1). Joint Rule 6–12 parallels Art. III, § 17 of the South Dakota Constitution and required that every bill be read twice by number and title upon introduction and upon final passage. There is no question that to be valid all legislation must be enacted in conformity with the constitution. *Minnehaha County v. South Dakota St. Bd. of Equal.,* 84 S.D. 640, 176 N.W.2d 56 (1970). While the respective rules allowed for suspension of the legislative rules, nothing allows for suspension of our state constitution. This issue raises a question as to the character of the evidence which must be accepted, or must be employed, to determine whether the legislature complied with the constitution. *Id.*

In *Barnsdall Refining Corporation v. Welsh,* 64 S.D. 647, 269 N.W. 853 (1936), this court sought to determine what information provided the best evidence on the constitutionality of legislation and stated that the sources of official information are the enrolled bills and the legislative journals. The court then considered three approaches regarding the use of these sources: (1) the "enrolled bill" rule which holds the enrolled bill as conclusive evidence of its proper enactment; (2) the "journal entry" rule which does not conclusively presume that enrolled bills were legally enacted and permits the court to look to the legislative journals to determine compliance with constitutional require-

ments;[3] and (3) the "modified enrolled bill" rule which holds an enrolled bill as conclusive evidence of proper enactment except as to constitutionally mandated journal entries which are specifically questioned. *Minnehaha County,* 84 S.D. at 642, 176 N.W.2d at 58, citing *Barnsdall, supra.* In *Barnsdall,* this court effectively adopted the "modified enrolled bill" rule and the court followed that choice in *Minnehaha County, supra.* The *Barnsdall* court presented six constitutional provisions that require legislative journal entries:

(1) The votes of the members elect taken on any question at the desire of one-sixth of those present shall be entered in the journal, S.D. Const. art. III, § 13.

(2) The results of all voice votes must be entered in the journals, S.D. Const. art. III, § 14.

(3) The vote on final passage taken upon last reading shall be entered in the journals, S.D. Const. art. III, § 18.

(4) The fact that the presiding officer of each house signed the bill or resolution in the presence of the respective house after public reading of the title shall be entered in the journal, S.D. Const. art. III, § 19.

(5) In the event of a gubernatorial veto and subsequent reconsideration of a bill, the results of the reconsideration vote and the names of the members voting for and against the bill shall be entered in the respective journals, S.D. Const. art. IV, § 9.

(6) Any amendments to the state constitution passed by a majority of the members-elect of each house shall be entered in the journals with the vote that was taken, S.D. Const. art. XXIII, § 1.

64 S.D. at 654–56, 269 N.W. at 856–57.

The modified enrolled bill rule precludes plaintiffs from introducing evidence of the legislature's alleged failure to comply with the requirements of Art. III, § 17, because a journal entry noting compliance with that section is not expressly required by the constitution. In re Opinion of the Judges, 84 S.D. 3, 166 N.W.2d 427 (1969).

Plaintiffs rely upon SDCL 2–7–12 which states that "[d]uly certified copies of such journals shall be received in all courts of the state as original evidence, and . . . shall be prima facie evidence of [legislative] proceedings." The statute clearly requires all state courts to admit or receive the journals as evidence; however, nothing in the statute or its history requires this court to examine the journals in order to determine the constitutionality of enacted and enrolled laws. This court has not held that application of the "modified enrolled bill" rule depends upon whether the bill's content or the bill's enactment is questioned. Plaintiffs have not indicated that the legislative journals for March 4, 1983, the day SB 256 was considered and passed, lack any of the *required entries* enumerated above. Consequently, under *Barnsdall, supra* and *Minnehaha County, supra,* and the "modified enrolled bill" rule adopted and followed by this court, the enrolled bill, SB 256, is considered conclusive of its contents and due enactment.

■ Plaintiffs next argue that the legislature improperly delegated its legislative power or authority to Congress by providing in section two of SB 256 that the meaning of the term "bank holding company" for purposes of SB 256 would be "as defined in the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Sec. 1841, et seq." This argument seems to take two turns. First that the delegation as drawn was unconstitutional and, secondly, that the delegation as drawn was unconstitutionally vague and indefinite.

The legislative power is vested in the legislature, S.D. Const. art. III, § 1, and the South Dakota Legislature may not abdicate nor delegate its essential power. *Schryver v. Schirmer,* 84 S.D. 352, 171 N.W.2d 634 (1969). Plaintiffs assert that incorporation of the federal definition by

---

**3.** Cases cited in the Henderson, J., dissent are obviously supportive of this rule. They are for the most part of the same general age as this court's decision in *Barnsdall, supra.*

reference into the SB 256 definition is an improper and unlawful delegation of legislative power and cite cases in which this court struck down improper delegations of power.

In the enactment of SB 256 the legislature did not delegate its power. The South Dakota Legislature may enact statutes, including statutory definitions, which adopt by reference federal statutory definitions. *See Schryver, supra.* This court followed and quoted *Schryver* in *State v. Johnson,* 84 S.D. 556, 557, 173 N.W.2d 894, 895 (1970), as follows:

"Statutes adopting laws or regulations of ... the federal government ... effective at the time of adoption are valid, but attempted adoption of future laws, rules or regulations of ... the federal government ... generally have been held unconstitutional ...."

In enacting section 2 of SB 256, the legislature adopted a definition found in the United States Code as that definition read at the time of adoption, as a fixed definition, not as it may be amended in the future. In determining the legislature's intent, we presume that the words used convey their ordinary meaning, unless the context or apparent intention of the legislature justifies a departure from that presumption. *Oahe Conservancy Subdistrict v. Janklow,* 308 N.W.2d 559 (S.D.1981); SDCL 2-14-1. The language used to incorporate 12 U.S.C. § 1841 et seq., when given its ordinary meaning, indicates an intent to adopt the existing definition. SB 256 adopts the federal definition "as defined" and "as amended"; this language is structured in the past tense. The importance of the distinction between the past and the future tense in relation to adoptive statutes was obvious in *State v. Johnson, supra,* wherein the court considered the language "and all amendments" to include future amendments. 84 S.D. at 557, 173 N.W.2d at 895.

The North Dakota Supreme Court in *State v. Julson,* 202 N.W.2d 145 (N.D. 1972), distinguished the language considered in *Johnson.* The phrase used in *Julson* was "as amended" and the *Julson* court pointed out that this phrase is in the past tense and held that the phrase incorporated a definition as it read on the date of enactment. 202 N.W.2d at 151. We hold that the *Julson* court's reasoning applies to the language of SB 256 and eliminates plaintiffs' delegation of authority claim.

Plaintiffs also contend that the definition of "bank holding company," as adopted by SB 256 from the "Bank Holding Act of 1956, as amended, 12 U.S.C. Sec. 1841, et seq...." is vague and indefinite because it refers to "12 U.S.C. Sec. 1841, *et seq.*" The reference includes 12 U.S.C. Sections 1841–1850 (section 1845 had been repealed). The definition of "bank holding company" found within the referenced statutes is cumbersome. It states what the term means, which companies qualify as bank holding companies and which do not; but plaintiffs' assertion that "[i]t is absolutely impossible to define with any degree of certainty whatsoever what a bank holding company is" from reading 12 U.S.C. section 1841 et seq., is not true. The basic definition and explanation of what is and is not included takes up only two and one-half pages and leaves no confusion regarding the purpose or subject of SB 256, nor the legislature's intent in using the federal definition. This court has held that a law may not be held invalid for vagueness unless the uncertainty renders execution impossible and the legislature's intent undiscernible. *Clem v. City of Yankton, supra.*

The fourth issue urged by the plaintiffs contends that the legislature violated five sections of the Bill of Rights, Article VI of the South Dakota Constitution, to-wit: (1) the established inherent rights of the people, section 1; (2) deprived persons of life, liberty or property without due process of law, section 2; (3) abridged the peoples' right to petition, section 4; (4) usurped the inherent political power of the people to alter or reform their government for their equal protection and benefit, section 26; and (5) endangered the blessing of a free government by abrogating a firm

adherence to justice and certain fundamental principles, section 27.

In framing this issue, plaintiffs have ignored the fact that of our three governmental branches, the legislature is closest to and best represents the people. Deference must be given to the peoples' right to govern themselves through the legislature and the courts should not supervise that process. This court may step in only when the legislature, beyond a reasonable doubt, has overreached its constitutional boundaries, otherwise the legislature's power is plenary. *State v. Board of Com'rs*, 53 S.D. 609, 222 N.W. 583 (1928).

 Plaintiffs have requested that this court compel the legislature to respond to the peoples' fundamental right to assert their political power in a matter of legislative concern. We must remember, however, that the people have elected the legislature as their representatives for that very purpose. The elected representatives of our citizens must exercise the peoples' inherent political power and the legislature has exercised the peoples' will in enacting SB 256. Control of the exercise of legislative power is not the function of the courts. *Schmitt v. Nord*, 71 S.D. 575, 27 N.W.2d 910 (1947). The haste with which an act is passed cannot be considered in determining its constitutionality and the court will not look into the motives, wisdom or haste connected with the passage of statutes; those matters are left to the legislature. *Moe v. Wederath*, 45 S.D. 295, 187 N.W. 544 (1922), followed in *State v. Spink Hutterian Brethren*, 77 S.D. 215, 90 N.W.2d 365 (1958).

 Except for joining in the dissent on the title issue and the cases referred to in footnote 3, *supra*, the treatise on constitutional law, filed as the other dissent herein, is an interesting dissertation on that author's views, but it is quite devoid of citations to any authorities supporting those views. In *Bi-Metallic Co. v. Colorado*, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915), Mr. Justice Holmes stated:

> Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule. 239 U.S. at 445, 36 S.Ct. at 142, 60 L.Ed. at 375.

—— U.S. at ——, 104 S.Ct. at 1066 citing *Bi-Metallic, supra*. The United States Supreme Court cited *Bi-Metallic, supra*, in *Minnesota State Board for Commercial Colleges v. Knight*, —— U.S. ——, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984). Justice O'Connor, who wrote the opinion, quoted the *Bi-Metallic* excerpt presented above and went on to state that: "Disagreement with public policy and disapproval of officials' responsiveness, as Justice Holmes' suggested in *Bi-Metallic, supra*, is to be registered principally at the polls." —— U.S. at ——, 104 S.Ct. at 1066.

SB 256 is declared constitutional and plaintiffs' complaint is dismissed.

FOSHEIM, C.J. and WOLLMAN, J., concur.

DUNN and HENDERSON, JJ., dissent.

DUNN, Justice (dissenting).

I would respectfully dissent.

Article III, § 21 of the South Dakota Constitution reads as follows: "No law shall embrace more than one subject, which shall be expressed in its title."

On the one hand, both the petitioner and the attorney general are in agreement that the real intent and purpose of SB 256 is to permit bank holding companies to own and operate insurance companies. On the other hand, the title reads: "An act to revise the provisions for ownership, powers, operations and taxation of certain banks and

their subsidiaries and to declare an emergency."

The question becomes whether this title gives any notice to anyone of a change in policy which would permit banks or bank holding companies to own and operate an insurance company. I submit that any fair reading of the title would not alert anyone that this was the intent and purpose of the act. In fact, it appears to be a careful orchestration to avoid giving notice of the true intent of the act.

The attorney general argues that the subject of the title is the "ownership, powers, operation, and taxation of certain banks," which broad title satisfies the constitutional requirements of Art. III, § 21 of the South Dakota Constitution; and that the title need not include the "object" of the act—that is, to give bank holding companies the right to own and operate insurance companies.

This argument just does not stand muster in construing the constitutional requirement by the courts of this state. In *South Dakota Ass'n, Etc. v. State, Etc.*, 280 N.W.2d 662, 665 (S.D.1979), this court stated:

> The provision of the South Dakota Constitution which is claimed to have been violated here is Article III, § 21, the purpose of which, as discussed at length in *State v. Morgan, supra,* is essentially threefold: 1) To prevent the combining into one bill of several diverse measures which have no common basis except, perhaps, their separate inability to receive a favorable vote on their own merits; 2) to prevent the unintentional and unknowing passage of provisions inserted in a bill of which the title gives no intimation; and 3) to fairly apprise the public of matters which are contained in the various bills and to prevent fraud or deception of the public as to matters being considered by the legislature.

Later on this same page we define the "subject" of an act as the "public or private concern for which the law is enacted." And in *McMacken v. State*, 320 N.W.2d 131, 139 (S.D.1982), in formulating the test to be used to determine whether a bill's title adequately expresses its subject, this court stated: "The central question is: Does the title put a person on notice of a germane subject in the body of the statute?"

It is true, as stated in *Clem v. City of Yankton*, 83 S.D. 386, 160 N.W.2d 125 (1968), that all of the details of an act need not be delineated in the title; but that does not mean that the true intent and purpose (the public or private concern for which the law is enacted) can be omitted from the title. This is the very mischief that the constitution and our case law seeks to prevent. This title fails completely in providing information that would prevent "the unintentional and unknowing passage of provisions inserted in a bill of which the title gives no intimation"; and in fairly apprising "the public of matters which are contained in the bill and to prevent fraud or deception of the public as to matters being considered by the legislature." *South Dakota Ass'n, Etc., supra.*

As stated in *State v. Morgan*, 2 S.D. 32, 44, 48 N.W. 314, 318 (1891), "[s]ound policy and legislative convenience dictate a liberal construction of title and subject matter." Broad titles have been upheld under this theory, but never where the act fails to give notice of the *only* real intent and purpose of the act. Since the only real purpose of the act is to permit banks and bank holding companies to own insurance companies, and since a fair reading of the title does not alert anyone of this purpose, I would hold that the title to SB 256 fails to meet the requirements of Art. III, § 21 of the South Dakota Constitution, and should be declared void.

HENDERSON, Justice (dissenting).

I join in Justice-Dunn's dissent which would strike down Senate Bill 256 of the 1983 South Dakota Session Laws as being unconstitutional as it violates Article III, § 21 of the South Dakota Constitution. Senate Bill 256 clearly embraces more than one subject for it amends four separate and distinct, pre-existing original acts. These

original acts, sought to be amended, pertain to (1) bank holding companies, (2) ownership of banks, (3) taxation of banks, and (4) taxation of insurance companies. The State of South Dakota fought like a tiger to spread before this Court the entire history of Senate Bill 256, not to mention all of the economic and political background of this bill. From the legislative history which has been spread before us, it is apparent that Senate Bill 256 has a history disclosing that a number of distinct subjects contained within its body were added subsequent to the original introduction of the bill, but the title was never altered or enlarged. This reinforces Justice Dunn's viewpoint that the true intent of the act is not contained in the title.

Senate Bill 256 was introduced through a rules suspension, passed both houses of the legislature without hearing or notice of hearing, was approved by the Governor and filed with the Secretary of State to become effective immediately due to an emergency clause, all between the hours of 10:00 a.m. and 6:47 p.m. on March 4, 1983. This was ram and jam legislation affecting every man, woman, and child in this state and has a profound effect on the lives of the citizenry of South Dakota.

Can the State Legislature literally do anything it wants to do, at any time, to anyone, without answering to a form of constitutional government which this state has? The answer is an emphatic "No!"

Senate Bill 256 is unconstitutional when tested within the framework of Article III, § 17 of the South Dakota Constitution, which provides that "[e]very bill shall be read twice, by number and title once when introduced, and once upon final passage, but one reading at length may be demanded at any time before final passage." Although this bill had two readings in the Senate, the Journal of the House of Representatives for March 4, 1983, discloses that there was never any first reading in the House of Representatives. The legislators of this state who enact the laws by which our citizens must live, should conform to the highest law of this state, the State Constitution, when they enact laws. In a spirit of fairness, the people of this state should be given a meaningful opportunity to be heard on matters of far-reaching consequence which affect their daily lives. This was not done on Senate Bill 256. Joint Senate and House Rule 6-12 requires that every bill shall be read twice, by number and title, once when introduced, and once upon final passage. Joint Rule 6-30 requires that no bill shall have its second reading or be put upon its final passage until at least one legislative day after the same has been reported to the House by the committee to which the same was referred and such report read to the body. Joint Rule 6-30 further provides that no report of any standing committee shall be acted upon until at least one legislative day after it has been read to the body. The Senate Journal discloses that there was no committee references or committee report between the first and second readings in that body. Why are there such rules of lawmaking? Article III, § 9 of the South Dakota Constitution provides the answer: "Each house shall determine the rules of its proceedings ...." These rules adopted by each house must necessarily be something of substance upon which the people of this state have the right to reasonably rely. They cannot be shallow expressions of meaningless quality and they should not be treated with disdain. Joint Rule 7-1.2 requires that agendas pertaining to bills and any other proposals which are to be considered at any meeting of a standing committee shall be posted on the bulletin board in each of the houses, and it is mandatory that at least one legislative day shall intervene between the date of posting and the date of committee hearing. On Senate Bill 256, the journal shows no committee reference, there was no hearing before the standing committee, and no notice of hearing. It is difficult to fathom why this legislation of such great economic impact to the people of this state was treated with callous disregard of the legislative process.

Article III, § 13 provides:

Each house shall keep a journal of its proceedings and publish the same from time to time, except such parts as require secrecy, and the yeas and nays of members on any question shall be taken at the desire of one-sixth of those present and entered upon the journal.

Our State Legislature currently maintains daily legislative journals which are printed and distributed to members of the legislature on each successive day. Each day, a legislative committee reviews these journals. If approved by the committee, they are adopted and certified on a daily basis. SDCL 2–7–8 provides that the daily journals are printed and delivered to the legislature on or before the convening of the legislature on the following legislative day. Great care is taken to see that each legislator is provided with a copy and these journals are printed at sizeable expense to the taxpayers. Am I now to believe that I should pay little heed to this constitutional mandate of keeping journals and disregard the importance of the legislators receiving these journals? SDCL 2–7–10 provides that the corrected daily copies of the journal of both the Senate and House of Representatives shall constitute the permanent record of the legislative proceedings. Aggregately, the State Constitution and state law cry out that these journals are creatures of absolute mandate. By inserting the constitutional mandate, the people of this state had to have intended that each body of the legislature should give a true and complete account of its legislative activities. Therefore, I am of the opinion that the application of the "enrolled bill rule," either in its original or modified form, forsakes the mandate of the people in the constitution and permits the legislators to be unaccountable as a practical matter for the procedures which they followed in the enactment of the law. The States of Minnesota and Michigan support my viewpoint. It is, in my opinion, the more enlightened approach. *Bull v. King*, 205 Minn. 427, 286 N.W. 311 (1939); *McClellan v. Stein*, 229 Mich. 203, 201 N.W. 209 (1924).

The manifest important purpose of requiring the Legislature to keep a journal is that the people whom they represent may be able to learn whether a published law has in truth been constitutionally enacted, and to have a permanent and reliable primary record evidencing its validity.

*McClellan v. Stein*, 201 N.W. at 212. For the record, it should be perceived that *Minnehaha County v. South Dakota State Bd. of Equalization*, 84 S.D. 640, 176 N.W.2d 56 (1970), predated by eight years the adoption of the modern Rules of Evidence by the Supreme Court in 1978 and codified in SDCL ch. 19–9. The entire purpose of these new Rules of Evidence is to develop the law of evidence so that in the end the truth will come out and proceedings will be justly determined. I do not believe in an archaic rule of evidence which prohibits this Court's ability to determine whether or not the legislature has followed constitutionally mandated requirements in the passage of laws. Looking at an enrolled bill, and no further, is to forsake the purpose of Article III, § 13 which mandates legislative journals. In *O'Neil v. Demers*, 44 R.I. 504, 511, 118 A. 677, 680 (1922), the Supreme Court of Rhode Island said:

Article 4, section 8, of the state Constitution provides that each house of the General Assembly shall keep a journal of its proceedings. These journals constitute public records of the matters therein contained. In our opinion, when a question arises, as in this case, regarding the validity of an enrolled act and depending for its proper determination upon the nature of the action of the houses of the General Assembly, we may, in the consideration of that question, receive the evidence furnished by the public records embodied in the legislative journals.

A more recent case elaborated:

While we give all due deference to the legislature as a coordinate branch of government, it is our solemn obligation to determine whether the act now before us was enacted in pursuance to the provisions of our constitution. Accordingly,

we have, in our quest for an answer to this question, taken judicial notice of the legislative journals for the ... General Assembly.

*State Terminal Corp. v. General Scrap Iron, Inc.*, 107 R.I. 24, 30, 264 A.2d 334, 337 (1970). That case appropriated the rationale of 1 Cooley, *Constitutional Limitations* 277 (8th ed. 1927):

> Each house keeps a journal of its proceedings, which is a public record, and of which the courts are at liberty to take judicial notice. If it should appear from these journals that any act did not receive the requisite majority, or that in respect to it the legislature did not follow any requirement of the constitution, or that in any other respect the act was not constitutionally adopted, the courts may act upon this evidence, and adjudge the statute void.

My position is this: The legislature can suspend the rules and pass wise or foolish laws, but, in that lawmaking process, it cannot directly contravene the State Constitution; making laws is the State Legislature's business but protecting the State Constitution is this Court's business. Viewing an enrolled bill and blessing it as being legal is to forsake, often times, truth. The "enrolled bill" should be the starting place to resolve disputes concerning the constitutional enactment of a statute. Journal entries should be permissive rebuttal of the presumption of the legality of an enrolled bill. We must not spurn SDCL 2–7–12, which essentially provides that a duly certified copy by the South Dakota Secretary of State of the legislature's daily journal shall be received in all courts of the state as original evidence. This Court completely overlooked this statute in its 1970 decision in the *Minnehaha County v. South Dakota State Bd. of Equalization* case. The state relies upon four old decisions in this Court concerning the "modified enrolled bill rule": *Barnsdall Refining Corp. v. Welsh*, 64 S.D. 647, 269 N.W. 853 (1936); *State v. Schmidt*, 42 S.D. 267, 173 N.W. 838 (1919); *Krakowski v. Waskey*, 33 S.D. 335, 145 N.W. 566 (1914); *Narregang v. Brown County*, 14 S.D. 357,

85 N.W. 602 (1901). These cases, in my opinion, would disallow a challenge or impeachment of the "contents" of a bill enacted by the legislature. However, these decisions should not be interpreted to mean that the modified enrolled bill rule should be held to apply to the determination of whether the legislature has followed mandatory constitutional procedures in the enactment of legislation. The people, as I have endeavored to note, have placed constitutional restrictions upon the methods of legislation and if the legislature neglects or willfully refuses to conform to these constitutional rules or is pressured to such extent that they forsake their constitutional duties, in the end, their labor, will be held to be of no effect and this Court has a duty to so declare. *Metropolitan Casualty Ins. Co. of New York v. Basford*, 31 S.D. 149, 139 N.W.2d 795 (1913). This Nation was founded with a checks and balance system. So it is, also, with this sovereign state. It is this Court's duty to determine when the legislature has disregarded constitutional mandates and restrictions. To vault a rule of evidence over the State Constitution and state law denigrates the role of this Court in a constitutional system of government. The constitution should be our rock and neither the legislature nor a rule of evidence conceived by the legal academe should prevail against it. When the legislature has flouted the State Constitution, and introduced and passed a law within nine hours, not giving the people of this state any due process in the lawmaking process, this Court owes its citizenry a duty to uphold the constitution. Like a lighthouse in a stormy night, the constitution can bring us to port safely but we shall surely shipwreck on the shoals if we pay it no heed.