Stephen J. LUCIER, Claimant
and Appellant,

v.

NORTH DAKOTA WORKERS
COMPENSATION BUREAU,
Appellee,

and

Housing Industry Training,
Inc., Respondent.

Civil No. 960082.

Supreme Court of North Dakota.

Nov. 13, 1996.

Opinion Denying Rehearing
Dec. 4, 1996.

Arnold V. Fleck (argued), of Wheeler Wolf, Bismarck, for claimant and appellant. Appearance by Stephen J. Lucier.

Lawrence A. Dopson (argued), Special Assistant Attorney General, Bismarck, for appellee.

MESCHKE, Justice.

Stephen J. Lucier appeals from a judgment affirming a Workers Compensation Bureau order denying him further disability and rehabilitation benefits because a vocational assessment showed he had a reasonable opportunity for substantial gainful employment at an alternate occupation. We affirm.

While employed as a personal care attendant with Housing Industry Training, Inc. (HIT) in Mandan, Lucier had a compensable back injury in August 1992 and got disability and rehabilitation benefits from the Bureau. Although he remained employed at the same wage by HIT at a modified position, HIT did not offer Lucier enough hours to meet the earning requirements of NDCC Chapter 65–05.1. The Bureau hired Professional Rehabilitation Management, Inc. (PRM) to evaluate other employment options for him. PRM prepared a Vocational Consultant's Report Assessment/Plan dated October 15, 1993, showing that, under NDCC 65–05.1–04(d), Lucier had the capability of returning to a modified or alternative occupation with any employer.

The plan detailed PRM's endeavors to return Lucier to work. Lucier's physical therapist reported

lifting will be tolerated occasionally to 50 pounds but should be limited to eye level only, with frequent lifts to 35 pounds from floor level to overhead height. Carrying tolerance was demonstrated to a maximum of 35 pounds. Forward bending and stooping should be avoided. It was noted that pushing could be tolerated up to 30 pounds and pulling could be tolerated up to 25 pounds.

Applying the United States Department of Labor Physical Demands Characteristics, this functional capacity assessment placed Lucier in the medium category of work. PRM determined that Lucier could tolerate a full eight-hour day of work if allowed to change posture on a frequent basis. After reviewing Lucier's prior employment as a warehouse worker and security guard, and after completing an analysis of his transferable skills, PRM concluded Lucier had the functional capacity and transferable skills for employment as a warehouse worker, security guard, or a sales route or light truck driver. Each of these positions is classified in the Dictionary of Occupational Titles as requiring light to medium physical demands. Lucier's treating physician certified that Lucier was capable of performing the work in these positions.

Through the use of the North Dakota B–96 Report of the North Dakota Job Order Index, PRM was satisfied that there were a substantial number of openings for each position in North Dakota, as well as in the Bismarck–Mandan region. PRM reviewed the North Dakota Wage and Benefit Survey to assess anticipated wages for those vocations. The rehabilitation coordinator also called employers in the selected job areas to learn the salaries offered for those positions. PRM concluded a warehouse worker could earn $6.40 per hour, a security guard $6.25 per hour, and a light truck driver $6.91 per hour. Lucier had been earning $5.75 per hour at HIT. The parties stipulated that, from January 15, 1992 until Lucier was injured in August 1992, his average weekly wage was $238. This was less than the $279 that represented 75 percent of the average weekly wage in the state on the date of the rehabilitation consultant's report. For a 40–hour work week at any of the proposed vocations, PRM calculated Lucier could earn between $250 and $276 per week.

The Bureau adopted PRM's plan and, on December 3, 1993, notified Lucier of its intention to discontinue his disability benefits effective December 16 because he had the transferable skills to obtain employment. On March 7, 1994, the Bureau issued its order denying disability and rehabilitation benefits after December 16, 1993, finding that Lucier was able to pursue employment as a light truck driver, sales route driver, security guard, or warehouse worker at a wage comparable to his pre-injury earnings and that he thus was no longer entitled to disability benefits.

Lucier requested a rehearing, alleging his rehabilitation plan was inadequate. The administrative hearing was rescheduled several times, and finally held June 8, 1995. The hearing officer found the rehabilitation plan "adequate" under NDCC Chapter 65–05.1, determining the "greater weight of the evidence indicates that considering Lucier's education, experience, skills, and medical limitations, he is able to pursue the three vocational goals identified in the October 15, 1993, rehabilitation plan—light truck driver, security guard, and warehouse worker." The hearing officer found Lucier's pre-injury earnings were properly calculated at $238 per week and that "[a]s a result of his transferable skills, he is able to perform competitive gainful employment and retains an earnings capacity equivalent to his preinjury earnings capacity." The hearing officer found that "a return to work in a related occupation within the statewide labor market suited to Lucier's education, experience, and marketable skills is feasible and appropriate because his preinjury wage can be met" and that "there is employment available in the statewide job market suited to Lucier's education, experience, and marketable skills, and within his medical limitations."

The Bureau adopted the hearing officer's findings and conclusions, and it adhered to its earlier order denying Lucier further disability and rehabilitation benefits. On appeal, the district court affirmed the Bureau's

denial of further benefits. Lucier appealed again.

## I

Our standard of review on appeal from a district court judgment on the decision of the Bureau is well settled. We review the Bureau's decision, not the decision of the district court, and we affirm the Bureau's decision unless its findings of fact are not supported by a preponderance of the evidence, its conclusions of law are not supported by its findings of fact, its decision is not supported by its conclusions of law, or its decision is not in accordance with the law. *Otto v. N.D. Workers Comp. Bureau*, 533 N.W.2d 703, 706 (N.D.1995); NDCC 28–32–19. As we said in *Ollom v. North Dakota Workers Compensation Bureau*, 529 N.W.2d 876, 878 (N.D.1995), in evaluating the Bureau's findings of fact, we do not make independent findings or substitute our judgment for that of the Bureau, but we determine only whether the Bureau reasonably reached its factual conclusions from the weight of the evidence on the entire record.

## II

The primary question is whether the vocational consultant's report gave Lucier a reasonable opportunity for substantial gainful employment in the state under NDCC 65–05.1–01(3). Part of that statute, at the time of Lucier's injury and on the date of the plan, directed:

> It is the goal of vocational rehabilitation to return the disabled employee to substantial gainful employment with a minimum of retraining, as soon as possible after an injury occurs. "Substantial gainful employment" means bona fide work, for remuneration, which is reasonably attainable in light of the individual's injury, medical limitations, age, education, previous occupation, experience, and transferable skills, and which offers an opportunity to restore the employee as soon as practical and as nearly as possible to the employee's average weekly earnings at the time of injury, or to seventy-five percent of the average weekly wage in this state on the date the rehabilitation consultant's report is issued

under section 65–05.1–02.1, whichever is less. The purpose of defining substantial gainful employment in terms of earnings is to determine the first appropriate priority option under subsection 4 of section 65–05.1–04 which meets this income test.

This vocational rehabilitation legislation was designed to return an injured employee to substantial gainful employment as quickly and with as little retraining as possible. *Baldock v. N.D. Workers Comp. Bureau*, 554 N.W.2d 441, 443 (N.D.1996). In enacting this statutory scheme, the legislature did not require the complete rehabilitation of a worker to his pre-injury earning capacity before getting him back to work. *See Thompson v. N.D. Workers' Comp. Bureau*, 490 N.W.2d 248, 254–255 (N.D.1992); *Smith v. N.D. Workers Comp. Bureau*, 447 N.W.2d 250, 254 (N.D.1989). We recognized in *Held v. North Dakota Workers Compensation Bureau*, 540 N.W.2d 166, 170 (N.D. 1995), "[j]ust as a rehabilitation plan cannot guarantee a job, neither can it guarantee a predetermined weekly wage." *See also Maginn v. N.D. Workers Comp. Bureau*, 550 N.W.2d 412, 416 (N.D.1996). Because "substantial gainful employment" might not be reached immediately in a rehabilitation program, the legislature has authorized payment of partial disability benefits for a certain period of time, rather than allowing the first lower earnings to invalidate the plan from the start. *See Held*; NDCC 65–05.1–06.1(2)(i). We review Lucier's challenges to his rehabilitation plan accordingly.

### A

Lucier argues the Bureau's findings that he is capable of performing the jobs identified in the rehabilitation plan and that those jobs are available in the state in sufficient numbers to give him a reasonable opportunity for employment are not supported by the greater weight of the evidence. We conclude the evidence reasonably supported the findings.

The vocational consultant testified she relied on the North Dakota B–96 Report, the Job Order Index, and telephone calls to employers in the region before deciding that the proposed jobs offered a reasonable opportu-

nity for employment. The B–96 report showed 439 job openings for warehouse workers in the state, with 120 openings in the Bismarck–Mandan region; 128 job openings for light truck drivers in the state, with 47 openings in the Bismarck–Mandan region; and 645 job openings for security guards in the state, with 28 openings in the Bismarck–Mandan region. Lucier does not quarrel with his placement in the light to medium work category or with the selected vocations within that category.

Rather, Lucier argues his experience in unsuccessfully applying for jobs in those planned vocations proves area employers actually require physical demands exceeding his limitations. Lucier insists his treating physician's approval of those vocations is irrelevant because it is based on the inaccuracy of the classifications in the Dictionary of Occupational Titles when applied to those positions in this locale. He claims the vocational consultant had a duty to personally survey the physical demand characteristics of potential employers in the region to determine if they actually require physical demands in excess of his limitations.

The question for the hearing officer, and for this court, is not whether the vocational consultant's plan would be eventually successful. Rather, the question is whether the plan, at the time, gave Lucier a reasonable opportunity to obtain substantial gainful employment in the state. Because some of those jobs Lucier sought or applied for may have required occasional lifting beyond the medium classification did not make the plan unfeasible from the beginning. Although the vocational consultant admitted that a job classified as medium level work in the Dictionary of Occupational Titles does not mean all work for all of the employers in that category is within that classified level, its medium level classification is strong evidence that most employers in the category do not require more than medium level work. Lucier, through his documentation at the hearing of approximately 50 unsuccessful job contacts, has not proved that most of the hundreds of job openings available in the selected vocations would require physical demands beyond his limitations.

If we accepted Lucier's argument, a vocational consultant's role under the law would become substantially equivalent to that of a private employment agent. But neither a rehabilitation plan nor a vocational consultant can guarantee a claimant a job or a particular wage. *See Maginn; Held.* We conclude that the Bureau reasonably found from the weight of the evidence that the rehabilitation plan, when it was prepared, gave Lucier a reasonable opportunity to obtain substantial gainful employment in the state.

B

■ Lucier argues the Bureau erred in failing to include the $180 monthly premium HIT was paying for his health insurance in calculating his "average weekly earnings at the time of injury" under NDCC 65–05.1–01(3). According to Lucier, including his employer's payment for his health insurance would increase his average weekly earnings to at least $281, more than the average weekly wage of $279 in the state when his rehabilitation plan was set. Because the vocational consultant's plan showed Lucier's employment opportunities would pay less than the $279 average weekly wage required, Lucier argues the rehabilitation plan failed at the outset. We disagree.

■ Generally, as *Wills v. Schroeder Aviation, Inc.,* 390 N.W.2d 544, 546 (N.D. 1986), explained, we construe statutory language "so that an ordinary person reading it would get from it the usual, accepted meaning." And, as *City of Fargo v. Stutlien,* 505 N.W.2d 738, 742 (N.D.1993), explained, we harmonize statutes on the same subject, if possible to give full force and effect to the legislative intent.

■ The phrase, "average weekly earnings," is not statutorily defined in the workers compensation law. Lucier is correct that, generally, the word, "earnings," is more comprehensive than the word "wages," and that "earnings" include not only money paid an employee but any other pecuniary benefit to the employee from the contract of employment. *See, e.g., First Nat'l Bank of Wilkes–Barre v. Barnum,* 160 F. 245, 247 (M.D.Pa.

1908); *B.F. Goodrich Rubber Co. v. Yellow Taxi Corporation*, 154 Misc. 440, 277 N.Y.S. 468, 470 (1935). However, the word "earnings" will be interpreted synonymously to the word "wages" in a statute if that meaning was intended by the legislature. *See Berlin Iron Bridge Co. v. Connecticut River Banking Co.*, 76 Conn. 477, 57 A. 275, 276 (1904). For NDCC 65–05.1–01(3), we believe the legislature unambiguously intended "earnings" and "wages" to be interpreted synonymously.

The problem with Lucier's argument is that, at the time of his injury, the legislature had generally defined "wages" as expansively as he would have us interpret "earnings" in this case: " 'Wages' means all remuneration payable in money *or a substitute for money for services rendered by an employee.*" NDCC 65–01–02(29) (1991) (Emphasis added).[1] Yet, the legislature specifically directed that this broad definition of "wages" does not include "[t]he cash value of health, medical, life, or other insurance benefits or retirement benefits." NDCC 65–01–02(29)(b)(2) (1991). Statutorily defining "wages" expansively to include the broader concept of "earnings" indicates that the legislature saw no significant difference in the meaning of the terms. *See also* Testimony of Dean J. Haas before the Senate Industry, Business, and Labor Committee on House Bill 1191, March 8, 1989, at p. 2 (describing substantial gainful employment under the statute as meaning "the employment must return the worker to his *pre-injury wage,* or to the average weekly wage in this State, whichever is less") (Emphasis added). Because the legislature defined "wages" to mean "earnings," while excluding health insurance benefits from his wages, it would be incongruous to include Lucier's health insurance benefits in his "average weekly earnings at the time of injury."

While Lucier's argument for including employer contributions to health or medical insurance merits legislative consideration, *see* 2 A. Larson, *The Law of Workmen's Compensation* § 60.12 (1996), the legislature has clearly elected to exclude health insurance benefits under NDCC 65–05.1–01(3) in calculating "average weekly earnings." We conclude the Bureau did not err in refusing to include Lucier's $180 in employer-paid health insurance premiums in its calculations.

C

■ Lucier argues the Bureau erred in failing to limit its calculation of his "average weekly earnings at the time of injury" to the hours he worked in the month before his work injury. We disagree.

The Bureau determined that "Lucier's average weekly wage or earnings at the time of the injury ... was properly calculated" at $238 under part of NDCC 65–01–02(4) (1993):

> "Average weekly wage" means the weekly wages the employee was receiving from all employments at the time of injury. The average weekly wage as determined under this section must be rounded to the nearest dollar. In cases where the employee's wages are not fixed by the week, they must be determined by using the first applicable formula from the schedule below:
>
> \* \* \* \* \* \*
>
> f. If there are special circumstances under which the average weekly wages cannot be reasonably and fairly determined by applying subdivisions a through e, an average weekly wage may be computed by dividing the aggregate wages during the twelve months prior to the injury by fifty-two weeks, or the number of weeks actually worked, whichever is less.

Under this subdivision (f), Lucier asserts that the Bureau improperly and unfairly computed his average weekly wage.

The Bureau computed Lucier's wage, not by averaging the full 52 weeks before his injury, but by averaging the 30 weeks from January 15, 1992 (when he had received his

---

1. This definition of "wages" has since been changed:
   "Wages" means an employee's remuneration from all employment reportable by employers to the internal revenue service as earned income for federal income tax purposes and lost as the result of a compensable work injury. NDCC 65–01–02(31) (1993); 1993 N.D. Laws Ch. 617 § 1.

last raise) to August 15, 1992 (just before his injury). This computation increased Lucier's average weekly wage to more than an average for the entire 52–week period. Lucier proposed that the Bureau average only the wages he earned during the four weeks before the injury because his hours had increased during those weeks, and because he testified his supervisor told him he would continue to work increased hours.

Whether Lucier would have continued to work hours equivalent to those worked during the four weeks before his injury is simply speculation. Lucier testified his increased hours during those last four weeks came from his working with two HIT clients whom other employees would not assist. Whether those clients would have remained with HIT or whether other HIT employees eventually would have assisted in their care was unpredictable. Lucier had no contractual commitment from HIT that he would work any set number of hours in the future, nor did HIT furnish any information on the subject at the hearing. Indeed, Lucier's work history with HIT showed fluctuations in wages earned, ranging from $211.84 per week to $312.90 per week during the 30 weeks used for the calculation by the Bureau.

The formula in subsection (f) of NDCC 65–01–02(4) was apparently intended to smooth out fluctuations in wages caused by changing circumstances in a claimant's employment. Beyond doubt, the Bureau's use of the 30–week period, rather than the 52–week period designated by the statute, benefited Lucier. We conclude that the Bureau did not err in refusing to base Lucier's average weekly wage on what he earned only during the four-week period just before his injury.

### III

We conclude the Bureau's findings are reasonably supported by a preponderance of the evidence, its conclusions are supported by the findings, its decision is supported by the conclusions, and its decision is in accordance with the law. We affirm the judgment of the district court affirming the Bureau order.

VANDE WALLE, C.J., and SANDSTROM, NEUMANN and MARING, JJ., concur.

### On Petitions for Rehearing

█ In our main opinion, we did not suggest that Lucier's unsuccessful actual experience in applying for jobs selected in the vocational consultant's plan is totally irrelevant to any claim for further disability and rehabilitation benefits. Rather, we sought to clarify that later evidence of unsuccessful job searching is not relevant to the threshold question of whether the plan, at the outset, reasonably gave Lucier an opportunity for substantial gainful employment in the state. At oral argument, Lucier conceded that was the only issue considered at the administrative hearing.

Obviously, evidence of Lucier's unsuccessful job search will be crucial for further relief under NDCC 65–05.1–04(2) to prove that he "is unable to obtain substantial employment as a direct result of injury. . . ." *See also Maginn v. N.D. Workers Comp. Bureau,* 550 N.W.2d 412, 415 (N.D.1996) (injured worker is required to make good faith work trial in a modified position option under NDCC 65–05.1–01(4)); NDCC 65–05–10(1) (for purposes of compensation for temporary partial disability resulting in decreased earning capacity, employee has burden "to show that the inability to obtain employment or to earn as much as the employee earned at the time of injury, is due to physical limitation related to the injury, and that any wage loss claimed is the result of the compensable injury"). Lucier's attorney informed us during oral arguments that an application for relief under NDCC 65–05.1–04 was still pending before the Bureau.

The petitions for rehearing are denied.