1997·ND 145

**Kevin McCABE, Claimant and Appellant,**

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU,**
**Appellee.**

**Civil No. 960336.**

Supreme Court of North Dakota.

July 17, 1997.

William A. Herauf (argued), of Reichert & Herauf, P.C., Dickinson, for Claimant and Appellant.

Brent J. Edison (argued), Special Assistant Attorney General, Bismarck, for Appellee.

Mark G. Schneider (argued), of Schneider, Schneider & Schneider, Fargo, for amicus curiae.

MESCHKE, Justice.

[¶ 1] Kevin McCabe appealed a district court judgment affirming an order of the Workers Compensation Bureau denying his claim for additional benefits for Permanent Partial Impairment [PPI]. We reverse and remand for entry of judgment directing the Bureau to award McCabe additional PPI benefits.

[¶ 2] McCabe injured his neck and back in 1988 when a tractor tire fell on him at work. The Bureau accepted McCabe's claim and paid benefits. In 1994, after McCabe had reached maximum medical recovery, Dr. Blair Bauer did a PPI evaluation. Bauer concluded that McCabe had suffered a 20–percent whole-body impairment. Bauer used the Range of Motion Model [ROM Model] given in the American Medical Association's "Guides to the Evaluation of Permanent Impairment" [Guides] in evaluating McCabe.

[¶ 3] After reviewing Bauer's recommendation, the Bureau's Medical Director, Dr. E.J. Laskowski, wrote to Bauer expressing disagreement with use of the ROM Model. Laskowski advised that McCabe should have been evaluated using the Diagnosis–Related Estimates Model [DRE Model] set out in a later edition of the Guides that would result in a 10–percent impairment. Laskowski asked Bauer to reevaluate McCabe's file, and suggested processing the claim at 10–percent impairment. Bauer responded, explaining his reasons for using the ROM Model and offering to "re-x-ray" and "re-order a work-up using the DRE Model."

[¶ 4] Rather than have Bauer reevaluate McCabe, the Bureau chose to have another doctor evaluate McCabe. In September 1994, Dr. Michael Martire used the DRE Model to evaluate McCabe for PPI, and concluded McCabe had a 10–percent impairment. Based upon Martire's report, the Bureau awarded McCabe $6,100 for a 10–percent whole-body impairment. McCabe requested a hearing. A hearing officer recommended findings of fact and conclusions of law to affirm the 10–percent award. The Bureau adopted the hearing officer's findings and conclusions, and entered a final order awarding PPI benefits for a 10–percent impairment. McCabe appealed, and the district court affirmed the Bureau's order. McCabe appealed to this court.

[¶ 5] On appeal from a district court's review of a decision by the Bureau, we review the Bureau's decision, not the decision of the district court. *Frohlich v. North Dakota Workers Compensation Bureau*, 556 N.W.2d 297, 300 (N.D.1996); *Lucier v. North Dakota Workers Compensation Bureau*, 556 N.W.2d 56, 59 (N.D.1996). We affirm the Bureau's decision unless its findings of fact are not supported by a preponderance of the evidence, its conclusions of

law are not supported by its findings of fact, its decision is not supported by its conclusions of law, or its decision is not in accordance with the law. *Frohlich*, 556 N.W.2d at 300; *Lucier*, 556 N.W.2d at 59. As *Berg Transport, Inc. v. North Dakota Workers Compensation Bureau*, 542 N.W.2d 729, 732 (N.D.1996), illustrates, the interpretation of a statute is a question of law.

■ [¶ 6] The answer to a question of law disposes of this appeal. The question is, under our statutory scheme, which version of the Guides should have been used to evaluate McCabe's impairment? When McCabe was evaluated in 1994, the relevant statutes were NDCC 65–05–12 and 65–01–02(26). NDCC 65–05–12 authorized payment for permanent impairment after the claimant had attained maximum medical improvement, and directed use of the Guides to evaluate impairment:

> Any rating of the percentage of functional impairment should be in accordance with the standards for the evaluation of permanent impairment as published in the *most recent edition* of the American medical association's "Guides to the Evaluation of Permanent Impairment" unless proven otherwise by clear and convincing medical evidence. [Emphasis added].

That relevant language had been enacted in 1989, *see* 1989 N.D.Sess. Laws ch. 765, § 4, and had not been amended or reenacted before McCabe's PPI evaluations in 1994.[1]

[¶ 7] The relevant language in NDCC 65–01–02(26), defining permanent impairment, had also been enacted in 1989:

> "Permanent impairment" means the loss of or loss of use of a member of the body existing after the date of maximum medical improvement or recovery, and includes disfigurement resulting from an injury if such disfigurement diminishes the ability

of the employee to obtain employment. The loss must be determined in accordance with and based upon the *most current edition* of the American medical association's "Guides to the Evaluation of Permanent Impairment". Any impairment award, not expressly contemplated within the American medical association's "Guides to the Evaluation of Permanent Impairment", must be determined by clear and convincing medical evidence.

*See* 1989 N.D.Sess. Laws ch. 765, § 1 [Emphasis added]. The entire section was amended and reenacted in 1991.[2] *See* 1991 N.D.Sess. Laws ch. 714, § 23. Each section directed use of "the most current (recent) edition of the Guides" for rating the percentage of permanent impairment.

[¶ 8] The chronologies of enactment of the relevant statutes and of publication of the various versions of the Guides shape the question of law to be answered in this case. When the statutory language designating the Guides as the standards for evaluation of permanent impairment was adopted in 1989, the Third Edition of the Guides, which designated only the ROM Model for evaluating spinal injuries, was in effect. The Third Edition Revised of the Guides, which retained the ROM Model, was published in December 1990 and was in effect when NDCC 65–01–02(26) was amended and reenacted in 1991. The Fourth Edition of the Guides was published in June 1993. The Fourth Edition designated the DRE Model as the preferred method for evaluating spinal injuries, but retained the ROM Model to be used to assist in determining what DRE category applied if there was uncertainty.

[¶ 9] The Bureau argues that the Fourth Edition was the "most recent" and "most current" edition of the Guides when McCabe

---

1. NDCC 65–05–12 was repealed by the 1995 Legislative Assembly. *See* 1995 N.D.Sess. Laws ch. 624, § 2. This bill, which was referred and subsequently approved by the voters at the June 1996 election, took effect on July 10, 1996. The current provision, NDCC 65–05–12.2(6), says in part:

   > Unless otherwise provided by this section, a doctor evaluating the impairment of an injured employee shall use the edition of the American medical association's "Guides to the Evalua-

   tion of Permanent Impairment" in effect on the date of the employee's evaluation to establish a rating for impairment of function.

2. Subsection 26 of NDCC 65–01–02 was amended and reenacted by the 1997 Legislative Assembly. *See* H.B. 1260, 55th Leg. (N.D.1997). A separate bill amended and reenacted NDCC 65–01–02 in its entirety, and renumbered subsection 26 as subsection 25. *See* H.B. 1269, 55th Leg. (N.D.1997).

was evaluated in 1994, so use of the DRE Model was designated. McCabe argues that the interpretation urged by the Bureau, automatically incorporating future versions of the Guides into the statute, would allow an unconstitutional delegation of legislative power to the American Medical Association. He therefore asserts we must instead read the statutes as incorporating the "most recent" and "most current" version of the Guides in existence when the statutes were enacted. Accordingly, McCabe asserts, because the Fourth Edition with the DRE Model had not been published when the relevant statutes were enacted in 1989 and when NDCC 65–01–02(26) was reenacted in 1991, only the ROM Model could be used to evaluate his degree of permanent impairment.[3]

[¶ 10] We must construe statutes to avoid constitutional conflicts. *E.g., Shaver v. Kopp*, 545 N.W.2d 170, 173 (N.D.1996); *Basin Elec. Power Coop. v. North Dakota Workers Compensation Bureau*, 541 N.W.2d 685, 689 (N.D.1996). As *Peterson v. Peterson*, 1997 ND 14, ¶ 26, 559 N.W.2d 826, illustrates, if a statute is capable of two constructions, one that would render it of doubtful constitutionality and one that would not, the constitutional interpretation must be selected.

[¶ 11] We considered a similar issue in *State v. Julson*, 202 N.W.2d 145 (N.D.1972). Julson had been criminally charged with delivery of LSD. Our criminal statutes incorporated by reference definitions of hallucinogenic drugs contained in the "Federal Food, Drug, and Cosmetic Act, as amended." *Id.* at 150 (quoting NDCC 19–02.1–01(22)). Julson argued the statute was an unconstitutional delegation of state legislative power to federal authorities because it attempted to incorporate future federal amendments into the North Dakota statutory scheme.

[¶ 12] Our *Julson* opinion described the constitutional problem, and reiterated the rule that a statute must be construed to avoid such a constitutional conflict:

> [W]e note that when a statute is susceptible of two constructions, one of which renders it unconstitutional and the other constitutional, it is the duty of the court to adopt the construction which, without doing violence to the fair meaning of the statute, will render it valid. In *Wallentinson v. Williams County*, 101 N.W.2d 571, 573 (N.D.1960), we said at syllabus 5:
>
> > In construing a statute, courts will avoid a construction which will hold such statute invalid, and such construction will not be adopted when the law is susceptible of another construction which is reasonably in harmony with the apparent object sought to be accomplished by the Legislature.

*Julson*, 202 N.W.2d at 151. Accordingly, the court in *Julson* construed the term "as amended" to refer to "the federal Act 'as amended' at the time of the enactment of the adoptive statute adopting by reference the federal Act and the regulations and changes promulgated prior to the enactment of the adoptive statute." *Julson*, 202 N.W.2d at 151; *see also Weber v. Weber*, 512 N.W.2d 723, 730–731 (N.D.1994) (Sandstrom, J., concurring). The court thus avoided a construction of doubtful constitutional validity.

[¶ 13] Numerous other courts hold that a statute that attempts to incorporate future changes of another statute, code, regulation, standard, or guideline is an unconstitutional delegation of legislative power. *See, e.g., International Ass'n of Plumbing and Mechanical Officials v. California Bldg. Standards Comm'n*, 55 Cal.App.4th 245, 64 Cal. Rptr.2d 129, 134 (1997); *People v. Pollution Control Bd.*, 83 Ill.App.3d 802, 38 Ill.Dec.

---

**3.** The distinction between the two models for evaluating spinal injuries is evident in a case like this, where the choice of Models brings widely divergent results. The ROM Model, also called the "Functional Model," uses a series of measurements of the spine with inclinometers to determine the patient's loss of range of motion. A percentage is assigned to the loss of range of motion, and that percentage is then combined with a separate percentage from a table based upon the specific spinal-disorder diagnosis to determine the total percentage of whole-body impairment.

Under the DRE Model, or "Injury Model," the patient is assigned an estimated percentage of impairment based upon the type of injury suffered. The injury is classified in one of eight categories, and the patient is assigned a whole-body impairment percentage based upon that category.

928, 932–933 404 N.E.2d 352, 356–357 (1980); *Gumbhir v. Kansas State Bd. of Pharmacy*, 228 Kan. 579, 618 P.2d 837, 842–843 (1980); *Board of Trustees v. City of Baltimore*, 317 Md. 72, 562 A.2d 720, 731 (1989); *Michigan Mfrs. Ass'n v. Director of Workers' Disability Compensation Bureau*, 134 Mich.App. 723, 352 N.W.2d 712, 715 (1984); *Meyer v. Lord*, 37 Or.App. 59, 586 P.2d 367, 371 (1978); *City of Chamberlain v. R.E. Lien, Inc.*, 521 N.W.2d 130, 132–133 (S.D.1994); *Independent Community Bankers Ass'n v. State*, 346 N.W.2d 737, 744 (S.D.1984); *Woodson v. State*, 95 Wash.2d 257, 623 P.2d 683, 685 (1980). In a case interpreting a statute that incorporated an insurance industry manual's definition of "employment in the logging industry" for purposes of workers compensation, the Michigan Court of Appeals stated the general rule:

It has been held that an act which adopts by reference the whole or a portion of another statute or code incorporates the standard as it existed at the time of the adoption, and does not include subsequent modifications, amendments or variations to the adopted statute or code. But, the adoption by reference of future legislation and rules are unconstitutional.

*Michigan Mfrs. Ass'n*, 352 N.W.2d at 715. Interpreting the statute to incorporate the version in existence at the time of its enactment, the court concluded: "Therefore the Act does not delegate authority to an association to create a standard but involves a valid adoption of a standard already in existence." *Id.* We agree with those courts taking this view.

[¶ 14] The Bureau urges us to follow *Madrid v. St. Joseph Hospital*, 122 N.M. 524, 928 P.2d 250 (1996), where the court upheld the New Mexico workers compensation statute directing use of the "most recent edition" of the Guides in determining impairment, concluding it was not an unconstitutional delegation of legislative powers. *See* N.M. Stat. Ann. 52–1–24(A). *Madrid* conflicts with our precedent in *Julson* and with the view expressed in the numerous cases we respect.

[¶ 15] We also see significant differences between the New Mexico statutory scheme and our workers compensation laws. The New Mexico laws allow use of other publications in determining impairment, and the percentage determined from applying the Guides is only one factor in a complex formula for calculating total impairment. *See* N.M. Stat.Ann. 52–1–24(A) and 52–1–26 et seq. By contrast, the North Dakota statutory scheme, as interpreted and applied by the Bureau, directs use of the most recent edition of the Guides to determine PPI benefits. On the whole, *Madrid* is not persuasive.

[¶ 16] The interpretation of the relevant statutes urged by the Bureau in this case would raise significant constitutional conflicts. This case presents ambiguous statutes capable of two different constructions, one of doubtful constitutional validity. Accordingly, we adopt the construction that does not raise constitutional conflicts. *Peterson*, 1997 N.D. 14, ¶ 26, 559 N.W.2d 826. We therefore construe NDCC 65–05–12 and 65–01–02(26) to adopt the "most recent" and "most current" edition of the Guides in existence at the time of their enactment. As a matter of law, that interpretation directed use of the ROM Model to evaluate McCabe's percentage of impairment when the PPI evaluations were done in 1994.

[¶ 17] The Bureau has not challenged the accuracy of Dr. Bauer's opinion, using the ROM Model, that McCabe has suffered a 20–percent whole-body impairment. The Bureau's position has consistently been that use of the DRE Model is mandated, not that Bauer's evaluation of McCabe's impairment using the ROM Model was improperly done. The hearing officer's findings and conclusions adopted by the Bureau do not contest the accuracy of Bauer's finding of 20–percent impairment using the ROM Model, nor has the Bureau called our attention to any evidence in the record challenging Bauer's determination using the ROM Model. Accordingly, we reverse and remand for entry of a judgment directing the Bureau to award additional PPI benefits to McCabe for a 20–percent whole-body impairment.

[¶ 18] VANDE WALLE, C.J., and SANDSTROM, NEUMANN and MARING, JJ., concur.